UNITED STATES of America, Appellee,

v.

Giovanni LARA, Defendant, Appellant.

United States of America, Appellee,

v.

George Sepulveda, Defendant, Appellant.

United States of America, Appellee,

v.

Terrence Boyd, Defendant, Appellant.

United States of America, Appellee,

v.

Shariff Roman, Defendant, Appellant.

United States of America, Appellee,

v.

George Perry, Defendant, Appellant.

United States of America, Appellee,

v.

Eryn Vasquez, Defendant, Appellant.

Nos. 97–2215, 97–2225, 97–2223, 97–2226, 97–2224, 97–2227.

United States Court of Appeals, First Circuit.

Heard May 5, 1999.

Decided June 30, 1999.

Valeriano Diviacchi, with whom Diviacchi Law Office was on brief, for appellant Lara.

Malcolm J. Barach for appellant Sepulveda.

Larry J. Ritchie, with whom Edward L. Gerstein was on brief, for appellant Boyd.

R. Scott Miller, Jr. for appellant Roman.

R. Scott Miller, Jr. with whom Richard J. Shea was on brief, for appellant Perry.

Pedro A. Jaile for appellant Vasquez.

Lisa Simotas, Attorney, Dep't of Justice, with whom Margaret E. Curran, United States Attorney, Gerard B. Sullivan, and Terrence P. Donnelly, Assistant United States Attorneys, were on brief, for the United States.

Before SELYA, Circuit Judge,
KRAVITCH,[*] Senior Circuit Judge, and
LIPEZ, Circuit Judge.

SELYA, Circuit Judge.

A federal grand jury indicted a coterie of defendants, including the six appellants (Giovanni "King G" Lara, George "King Paradise" Sepulveda, Terrence "King Bullet" Boyd, Shariff "King Biz" Roman, George "King Animal" Perry, and Eryn "King Guy" Vasquez) for a multiplicity of crimes arising out of their involvement in the Providence chapter of the Almighty Latin King Nation. Following a 44–day trial, each appellant was convicted on one or more of the following charges: racketeering, 18 U.S.C. § 1962(c); conspiracy to commit racketeering, *id.* § 1962(d); violent crime in aid of racketeering (including two murders and two attempted murders), *id.* § 1959(a)(1) & (5); carjacking, *id.* § 2119(3); witness intimidation, *id.* § 1512(b); use or carriage of a firearm during a crime of violence, *id.* § 924(c); and being a felon in possession of a firearm, *id.* § 922(g). The district court sentenced five of the appellants to life imprisonment and the sixth, Vasquez, to 100

months in prison. These appeals followed. We affirm.

## I. BACKGROUND

We offer a thumbnail sketch of the interrelationship between the appellants and the Latin Kings, taking the information contained in the record in the light most congenial to the jury's verdict. *See United States v. Houlihan*, 92 F.3d 1271, 1277 (1st Cir.1996). We eschew an exposition of the other evidence, preferring to discuss that evidence in the body of the opinion as it pertains to our consideration of particular points raised by the appellants.

The Latin Kings originated in Chicago in the 1940s. Over time, the street gang's influence spread to other venues. The movement migrated east to Providence in the early 1990s. Though some chapters of the Latin Kings, called Charter Nations, require Hispanic descent as a condition of membership, others (like the Providence chapter) allow persons of all races and ethnicities to join.

Members of the Latin Kings signal their affiliation by sporting beads and other accouterments (including tattoos) in the gang's colors—black and gold. They pay dues, attend weekly meetings, and undertake "missions" (a euphemism that covers an array of activities ranging from running errands to committing violent crimes) when directed by gang leaders. Respect and security rank among the gang's paramount concerns: the Latin Kings routinely discipline members for disrespectful behavior or for discussing Latin King business with outsiders. Discipline runs a lengthy gamut from the "silent treatment" (suspension of all communications with other gang members), to revocation of drug use privileges, to a "bounce" (a time-controlled beating limited to certain areas of the body), to death.

The Almighty Latin King Nation is a hierarchical organization, and each of the

[*] Of the Eleventh Circuit, sitting by designation.

appellants held one or more leadership positions within the Providence chapter. Sepulveda served as the group's president (sometimes called "Inca"). Boyd served as the vice-president (sometimes called "Cacique"), and later succeeded Sepulveda as president. Roman served as the chief enforcer (a position previously held by Lara and subsequently held by Perry), and replaced Boyd as vice-president. Vasquez functioned as the group's philosopher and then graduated to the post of investigator.

Against this backdrop, we proceed to survey the appellants' assignments of error. We start with two issues pertaining to jury selection and then treat three of the trial court's evidentiary rulings. At that juncture, we address a series of Rule 29 claims. Finally, we tackle a perceived problem with the jury instructions. To the extent that the appellants mount other claims, we reject them out of hand, without elaboration.

## II. JURY SELECTION ISSUES

Most of the appellants join in two challenges related to jury selection: all save Perry argue that the jury pool was not composed of a fair cross-section of the community, and all calumnize the prosecution's use of a peremptory challenge to strike an African–American prospective juror. We find no merit in either of these assigned errors.

### A. *The Fair Cross–Section Claim.*

■ The Constitution affords a criminal defendant the right to a trial "by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI. This constitutional command requires that juries be selected from a representative cross-section of the community. *See Duren v. Missouri,* 439 U.S. 357, 358–59, 363–64, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979); *Taylor v. Louisiana,* 419 U.S. 522, 528, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). Congress codified that requirement in the Jury Selection and Service Act, (JSSA), 28 U.S.C. § 1861.

The appellants assert that the venires from which the district court selected both their grand and petit juries defied this imperative. We do not agree.

The appellants base their assertion on Rhode Island's failure to comply with the National Voter Registration Act (NVRA), 42 U.S.C. §§ 1973gg to 1973gg–10 (1994). This statute, known colloquially as the motor voter law, took effect in Rhode Island on January 1, 1995. It requires states to accept voter registration applications in tandem with applications for drivers' licences and other permits, and to establish procedures to facilitate that process. *See id.* §§ 1973gg–2(a), 5(a). Rhode Island has conceded that it did not fully comply with the NVRA. *See League of Women Voters v. Rhode Island Bd. of Elections,* No. 96–442ML (D.R.I. Sept. 12, 1996) (consent decree). Because the District of Rhode Island derives its jury wheel from the state's voter registration lists, *see In re Amended Juror Selection Plan,* Misc. No. 75–209 (D.R.I. Oct. 6, 1993), the appellants claim that this noncompliance rendered the District's jury venires unrepresentative and transgressed both the Sixth Amendment and the JSSA.

■ This claim is fully preserved with respect to the five appellants who proffer it here. Although only Sepulveda and Boyd moved to dismiss the indictment on this basis, the district court permitted Lara, Roman, and Vasquez to adopt Sepulveda's and Boyd's position.

■ Though preserved, the claim is unavailing. In order to establish a fair cross-section violation under either the Sixth Amendment or the JSSA, a criminal defendant must make a tripartite showing comprising cognizability (i.e., that the group alleged to be excluded is a distinctive group), underrepresentation (i.e., that the group is not fairly and reasonably represented in the venires from which juries are selected), and systematic exclusion (i.e., that the discerned underrepresentation is due to the group's systematic exclu-

sion from the jury-selection process). *See Duren*, 439 U.S. at 364, 99 S.Ct. 664; *United States v. Royal*, 174 F.3d 1, 6–7 (1st Cir.1999). Assuming, arguendo, that the appellants have made the first of these three showings,[1] they plainly have failed to satisfy either the second or third part of the test. Because the *Duren* test is conjunctive—the proponent of a fair cross-section claim must satisfy all three of its elements—either of these failings suffices to defeat the instant claims.

We start with underrepresentation. A showing of underrepresentation must be predicated on more than mere guesswork. Such a showing requires competent proof (usually statistical in nature). *See, e.g., Duren*, 439 U.S. at 364–65, 99 S.Ct. 664; *United States v. Pion*, 25 F.3d 18, 22–23 (1st Cir.1994); *see also United States v. Hafen*, 726 F.2d 21, 23–24 (1st Cir.1984) (considering the statistical methodologies that might be used to determine underrepresentation and selecting the absolute disparity method). The single supporting document filed in the district court in connection with the appellants' motions to dismiss was an affidavit attesting to the legislative history and purposes of the NVRA, and the genesis of the consent decree. This affidavit does not supply any foundation for a finding that the representation of Hispanic venirepersons in the District was unfair, unreasonable, or in any way disproportionate to their numbers in the community.

A successful fair cross-section claim also requires competent proof of the systematic nature of the exclusionary mechanisms leading to the underrepresentation. *See Duren*, 439 U.S. at 366–67, 99 S.Ct. 664; *Royal*, 174 F.3d at 6–7]. The supporting affidavit in this case offers no reason to believe that any systematic exclusion of Hispanics occurred in the selection pro-

cess, let alone that it caused any material underrepresentation. The NVRA is addressed to heightening overall popular participation in federal elections, as well as to increasing voter registration by members of racial minorities. *See* 42 U.S.C. § 1973gg. The naked fact of Rhode Island's noncompliance with the statute provides no insight into whether voter registration lists (and, therefore, the jury wheel compiled from those lists) were skewed for or against minorities if skewed at all. Since the appellants' proffer does not identify any systemic shortcoming or operational deficiency that would tend to lessen Hispanic representation in the master jury wheel disproportionately, it does not satisfy the third part of the *Duren* test. *See Pion*, 25 F.3d at 22–23.

It follows inexorably from what we have said that the district court did not err in rejecting the pretrial motions to dismiss the indictment for want of a fair cross-section.

### B. *The Batson Challenge.*

The appellants unanimously claim that the prosecution impermissibly used a peremptory challenge to banish a prospective juror, Bruce King, because of his race. We rehearse the events that undergird this complaint.

Relatively late in the voir dire process, King, a black male, was tentatively seated. The district judge, the prosecutor, and several defense attorneys proceeded to question him. Sepulveda's lawyer noted that the evidence would include allusions to racial epithets and mention of the fact that many Latin King chapters did not welcome African Americans. He then asked whether such testimony might affect King's ability to decide the case. King replied, "I believe I can be a fair and impartial juror under any circumstance." Upon hearing

---

1. Although the appellants' filings in the lower court did not identify an allegedly excluded group, they maintain on appeal that the jury pool lacked appropriate Hispanic representation. Hispanics comprise a distinctive group that meets the cognizability requirement. *See, e.g., United States v. Rioux*, 97 F.3d 648, 654 (2d Cir.1996); *United States v. Esquivel*, 88 F.3d 722, 726 (9th Cir.1996).

this declaration, Perry began to applaud. The court silenced him and the voir dire continued. When the defense team had completed its interrogation of King, the prosecutor asked that Perry's effusion be placed on the record. He then queried King as to whether the applause made him uncomfortable. King responded in the negative, explaining that he did not know why Perry felt impelled to clap.

Because the prosecutor's questions suggested a concern over whether the incident would jeopardize King's ability to render an impartial verdict, Roman's counsel requested an opportunity to discuss the matter. He debunked the notion that King had been compromised and emphasized that King was one of very few potential black jurors who might be eligible for service in the case—perhaps the only one. Judge Lisi permitted King to leave for the day and reprimanded Perry, warning him that another outburst would result in his removal from the courtroom. The dialogue between the court and counsel then resumed. The prosecutor summarized his position and speculated that "[i]f we can find other black jurors in the panel to sit," he might use a peremptory strike to eject King from the jury. The day's proceedings ended without resolving the issue of King's continued service.

The next day, the prosecutor moved to excuse King for cause and the parties argued the point. The district judge took the matter under advisement overnight. She ultimately denied the motion, explaining:

> On the record, that is, taking Mr. King's statements at face value as I do, I do not believe that cause exists to remove him from this panel.... [I]t appears from what I observed here in the courtroom and what occurred on the record afterwards with the colloquy between the Government and Mr. King, that Mr. King was not affected by Mr. Perry's action.

■ When the time arrived for the parties to exercise their peremptory strikes,

the government challenged King. The appellants branded this strike race-based and violative of the Equal Protection Clause. After hearing argument, the district court overruled their objections. Because this decision resolves a mixed question of law and fact that is peculiarly fact-sensitive, we review it for clear error. *See United States v. Bergodere*, 40 F.3d 512, 516 (1st Cir.1994).

■ It is by now common ground that race is an unconstitutional proxy for juror competence and impartiality, and, therefore, that criminal defendants have an equal protection right to jury selection procedures that are free from racial biases. *See Powers v. Ohio*, 499 U.S. 400, 404, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *Bergodere*, 40 F.3d at 515. We have directed the use of a three-part framework to aid in assessing the validity of an allegation that the prosecution stooped to employ a race-based peremptory strike. *See Bergodere*, 40 F.3d at 515 (citing, *inter alia*, *Batson*, 476 U.S. at 96–98, 106 S.Ct. 1712). This framework envisions that:

> [T]he defendant must make a prima facie showing of discrimination in the prosecutor's launching of the strike. If the defendant fulfills this requirement by establishing, say, a prima facie case of a racially driven impetus, then the prosecutor must proffer a race-neutral explanation for having challenged the juror.
>
> .... If the prosecutor complies, then, at the third and final stage, the district court must decide whether the defendant has carried the ultimate burden of proving that the strike constituted purposeful discrimination on the basis of race.

*Id.* (citations and footnote omitted). In deploying this framework, the prosecutor's second-step burden of proffering a race-neutral explanation for the strike "is merely a burden of production, not a burden of

persuasion," and the defendant retains the devoir of persuasion throughout the course of the inquiry. *Id.*

In this case, we can truncate the usual inquiry. In the district court, as here, the government tacitly acknowledged that the defendants had (or could have) offered a prima facie showing that the strike appeared discriminatory. Thus, the first step of the pavane need not detain us. *See Hernandez v. New York*, 500 U.S. 352, 359, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

At the second step, the government must advance a race-neutral explanation for its peremptory challenge. In an effort to meet this requirement, the prosecutor pointed to Perry's applause, theorizing that Perry might have been trying either to create an affinity with King or to intimidate him. In either event, the prosecutor stated, he feared that King's impartiality would wane, particularly after King learned of the atrocities that the government ascribed to Perry and his confederates. Although the appellants contended that this explanation was bogus, the district judge accepted it. King was excused, and the empanelment continued. When sworn, the jury included one juror who described himself as Mexican and one who appeared non-Caucasian (but from whom no racial information was elicited).[2]

We discern no clear error in Judge Lisi's ruling. In order to meet the second-step requirement, a prosecutor's explanation need only be unrelated to race *on its face.* At this point, neither the persuasiveness of the explanation nor the credibility of the prosecutor is at issue. *See Purkett v. Elem*, 514 U.S. 765, 768–69, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam); *Hernandez*, 500 U.S. at 360, 111 S.Ct. 1859. Perry's clearly inappropriate courtroom behavior and its potential effect on King's ability to serve as a juror are in no way related to race, and, thus, the

proffered reason crosses this modest threshold. *See, e.g., Purkett*, 514 U.S. at 769, 115 S.Ct. 1769 (finding prosecutor's explanation that strikes of black jurors were based on beards and long, unkempt hair to be race-neutral for purposes of the second *Batson* way station).

This leaves the third, and final, determination: whether the appellants have proven that the strike constituted racial discrimination. This decision boils down to whether the appellants have convinced the district court that the race-neutral explanation furnished by the government rings hollow. Because the question is intensely fact-driven and the answer often pivots on credibility, appellate tribunals must scrutinize the trial court's response under a highly deferential glass. *See Hernandez*, 500 U.S. at 364–65, 111 S.Ct. 1859; *Batson*, 476 U.S. at 98 n. 21, 106 S.Ct. 1712.

In this case, the trier credited the government's explanation:

> I have heard the explanation of the Government and I have observed [the prosecutor's] reaction to Mr. Perry's applause. And I cannot say that [the prosecutor's] challenge here is based on race. [His] challenge is based, as he says, on conduct and on the concern that he has—and quite frankly, that the Court has—as to what effect Mr. Perry's misbehavior would have on Juror King . . . .

The judge also ·noted that she had observed no pattern of discrimination in the government's use of its peremptory challenges—a fact that may be entitled to special weight in determining whether a prosecutor's race-neutral explanation for a peremptory challenge is pretextual. *See Hernandez*, 500 U.S. at 363, 111 S.Ct. 1859.

The appellants urge us to hold that Judge Lisi committed clear error in

been of Cape Verdean or Native American descent.

upholding the prosecutor's strike. They assert that she misunderstood the applicable legal standard, but the record belies this *ipse dixit.* They also harp on the prosecutor's earlier statement that he might consider exercising a peremptory challenge against King if other black jurors were empaneled. This statement, the appellants say, suggests that the government in certain circumstances would have left King on the jury *solely because he was black,* thus proving that the prosecutor had race in mind and deliberately injected it into the jury-selection calculus. While we do not defend the prosecutor's comment (which was both insensitive and unfortunate), we find no clear error in the district court's conclusion that the prosecutor's remark did not discredit his race-neutral explanation. *See Cumpiano v. Banco Santander P.R.,* 902 F.2d 148, 152 (1st Cir. 1990) (explaining that no clear error exists unless review "on the whole of the record" generates "a strong, unyielding belief that a mistake has been made").

 The governing principle, of course, is that a person's race must be regarded as "unrelated to his fitness as a juror." *Batson,* 476 U.S. at 87, 106 S.Ct. 1712. Here, the record makes manifest that Judge Lisi took this principle fully into account, and her resolution of the issue of pretext based on her assessment of the prosecutor's demeanor and credibility cannot be disturbed. Perry's paroxysm injected an imponderable into the equation. Trial lawyers understandably fear the unknown, and that fear, in itself, is not indicative of a race-based viewpoint. When the prosecutor voiced this sort of concern, the district judge was well-situated to assess his candor. The judge did so here—and we will not second-guess her assessment. After all, when the evidence gives rise to competing interpretations, each plausible, the factfinder's choice between them cannot be clearly erroneous. *See Smith v. F.W. Morse & Co.,* 76 F.3d 413, 423 (1st Cir.1996); *Johnson v. Watts Regulator Co.,* 63 F.3d 1129, 1138 (1st Cir.1995).

## III. EVIDENTIARY ISSUES

The appellants level a number of criticisms relating to the admission of evidence. Only three of these criticisms warrant discussion.

### A. *Coconspirator Testimony.*

Boyd disputes the district court's admission of certain videotaped statements under Fed.R.Evid. 801(d)(2)(E).[3] We sketch the circumstances.

The government played videotapes for the jury during the trial. These videotapes had been secured with the cooperation of a confidential informant, Jose Ortiz, at whose home Latin King meetings sometimes were held. The videotape about which Boyd complains includes a solitary mention of him by Roman while discussing how Mendez's murder came about. Boyd contemporaneously objected to the admission of this evidence against him on the ground that it fell outside the scope of Rule 801(d)(2)(E). He also seasonably requested an instruction limiting the jury's consideration of the evidence to other defendants. The trial judge overruled the objection, admitted the evidence unconditionally, and declined to give the requested limiting instruction.

 We review challenges to the admission of evidence for abuse of discretion. *See Williams v. Drake,* 146 F.3d 44, 47 (1st Cir.1998). On this basis, Boyd's challenge stumbles at the starting gate. His argument addresses the admissibility of the evidence solely in respect to the only charge on which the jury found him guilty—the murder-in-aid-of-racketeering

---

3. In relevant part, the rule removes "statement[s] by a coconspirator of a party during the course and in furtherance of the conspiracy" from within the definition of hearsay (and thus narrows the traditional prohibition against the admission of hearsay evidence). Fed.R.Evid. 801(d)(2)(E).

charge. But Boyd was also tried on (albeit not found guilty of) racketeering and racketeering conspiracy charges under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962, and the tape clearly was admissible against him vis-à-vis those charges.

 This circumstance is dispositive, for the designation of a declaration as non-hearsay under Rule 801(d)(2)(E) is neither count-specific nor conspiracy-specific. *See United States v. Innamorati,* 996 F.2d 456, 486 (1st Cir.1993). Subject to relevancy and similar considerations, out-of-court statements of a declarant co-conspirator, if made during and in furtherance of a conspiracy, are admissible for the truth of the matter asserted, regardless of whether the conspiracy furthered is charged or uncharged, *see United States v. Candelaria–Silva,* 162 F.3d 698, 706 (1st Cir.1998); *United States v. Rivera,* 68 F.3d 5, 7 (1st Cir.1995), and regardless of whether it is identical to or different from the crime that the statements are offered to prove, *see Innamorati,* 996 F.2d at 486. Hence, the trial court did not abuse its discretion in overruling Boyd's objection.

 We think that the court also appropriately refused Boyd's request for a limiting instruction. When the government proffered the videotape, Boyd requested an instruction that "the jury c[ould] not consider the statements of Shariff Roman as substantive evidence or proof that Boyd participated in the murder of Mendez." But the Mendez murder was not charged against Boyd merely as a violent crime in aid of racketeering, 18 U.S.C. § 1959(a)(1), but also was charged as one of the predicate acts in the RICO count, *id.* § 1962(c). As noted above, the challenged statements were admissible non-hearsay evidence as to the latter count. Thus, the jury was entitled to consider the relevant portions of Roman's statements *on that count* as to all the defendants (Boyd included). On this basis, the proposed instruction—which swept broadly rather than asking narrowly that the jury disregard the statements in respect to the *separate* charge that the murder was a violent crime in aid of racketeering—would at best have been confusing, and at worst, legally erroneous. It is, of course, hornbook law that a party cannot rewardingly assign error to a trial court's refusal to give a confusing, misleading, or legally incorrect instruction. *See United States v. DeStefano,* 59 F.3d 1, 4 (1st Cir. 1995); *United States v. David,* 940 F.2d 722, 738 (1st Cir.1991).

 In all events, any error was benign. We introduce this point by noting that our cases seem inconsistent on what standard of review attends the harmlessness *vel non* of errors in the admission of hearsay evidence. *Compare, e.g., United States v. Awon,* 135 F.3d 96, 101 (1st Cir. 1998) (indicating that the erroneous admission of hearsay evidence evokes a "harmless beyond a reasonable doubt" standard), *with e.g., United States v. Tse,* 135 F.3d 200, 209–10 (1st Cir.1998) (stating that such an error is harmless so long as " 'it is highly probable that the error did not contribute to the verdict' ") (quoting *United States v. Trenkler,* 61 F.3d 45, 60 n.22 (1st Cir.1995)). Here, however, we need not resolve the dilemma, inasmuch as the videotape is not significantly inculpatory as to Boyd's involvement in the commission of the Mendez murder. The only statement on the tape that relates to Boyd at all occurs when Roman says that, at the time of the murder, "Bullet was, um, in Training School still, you know what I mean?" This statement, on its face, is benign (perhaps exculpatory). Still, in a feat of linguistic legerdemain, the government construed this statement at trial to mean that Boyd had escaped from the Training School, and thus was available when the Latin Kings contrived the murder plot. Even if this odd interpretation is accepted,

however, the statement only showed that Boyd was available at the time of the Mendez murder. Since several percipient witnesses testified not only to his availability, but also to his actual presence at the meetings in which the Latin Kings planned Mendez's murder, any error in refusing to give the requested instruction was harmless beyond a reasonable doubt because there was no realistic possibility that admission of the evidence influenced the outcome of the trial as to Boyd's guilt on the single count of conviction (commission of a violent crime in aid of racketeering). *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (explaining that the harmless-beyond-a-reasonable-doubt standard set forth in *Chapman v. California*, 386 U.S. 18 (1967), requires reversal only if there is a "reasonable possibility" that the error contributed to the outcome); *cf. United States v. Ladd*, 885 F.2d 954, 957–58 (1st Cir.1989) (finding erroneous admission of evidence harmless when the evidence served only to prove a point well documented by other evidence).

### B. *Testimony of Cooperating Witnesses.*

During the trial, the government offered the testimony of several cooperating witnesses, who testified in return for promises that they would not be charged federally for certain crimes and/or for recommendations of lenient sentencing in respect to crimes for which they had been or would be charged. Five of the appellants (Boyd excluded) insist that the lower court should have barred these witnesses from testifying, and that its failure to do so necessitates a new trial.

The appellants pin their hopes on a witness-bribery statute which provides in relevant part:

> Whoever ... directly or indirectly, gives, offers or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing, or other proceeding, before any court ... authorized by the laws of the United States to hear evidence or take testimony ...

shall be fined under this title or imprisoned for not more than two years, or both.

18 U.S.C. § 201(c)(2). In mid–1998, a panel of the Tenth Circuit interpreted this statute to forbid testimony given in exchange for promised leniency, and applied an exclusionary rule to such testimony. *See United States v. Singleton*, 144 F.3d 1343 (10th Cir.1998) (*Singleton I* ). Since then, the federal courts have been inundated with a flood of what have come to be called "*Singleton* arguments," and we take the opportunity to dam this misguided stream.

*Singleton I* appears to us to be nothing more than an aberration, and we reject its reasoning and result. We use the term "aberration" advisedly, because the opinion has been overruled in the circuit of its birth, *see United States v. Singleton*, 165 F.3d 1297, 1298 (10th Cir.1999) (en banc) (*Singleton II* ), *cert. denied*, —— U.S. ——, 119 S.Ct. 2371, —— L.Ed.2d —— (1999), and several other courts of appeals have disavowed its anfractuous reading of section 201(c)(2), *see, e.g., United States v. Lowery*, 166 F.3d 1119, 1122–24 (11th Cir. 1999); *United States v. Ramsey*, 165 F.3d 980, 987 (D.C.Cir.1999); *United States v. Ware*, 161 F.3d 414, 418 (6th Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 1348, 143 L.Ed.2d 511 (1999); *United States v. Haese*, 162 F.3d 359, 366–68 (5th Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 1795, 143 L.Ed.2d 1022 (1999). We, too, have intimated as much. *See United States v. Hernandez–Albino*, 177 F.3d 33, 41 (1st Cir.1999) (holding that refusal to follow *Singleton I* does not constitute plain error). Today, we make our position explicit and unqualified.

 There are several reasons why section 201(c)(2) cannot be invoked as a bright-line barrier to the government's use of witnesses whose cooperation has been secured by agreements not to prosecute or by promises of recommended leniency. The most basic reason is that section 201(c)(2) does not apply at all to the federal sovereign *qua* prosecutor. *Accord Ramsey*, 165 F.3d at 987–90; *Haese*, 162

F.3d at 366–67; *Ware*, 161 F.3d at 418–21. After all, "[s]tatutes of general purport do not apply to the United States unless Congress makes the application clear and indisputable," *Singleton II*, 165 F.3d at 1300, and Congress has taken no such steps in respect to this statute. Reliance on this tenet is particularly apt where, as here, the failure to honor it would divest the government of a long-established prerogative and, in the bargain, lead to an eccentric result. *See Nardone v. United States*, 302 U.S. 379, 383, 58 S.Ct. 275, 82 L.Ed. 314 (1937).

■ We add, moreover, that the *Singleton I* panel's reading of section 201(c)(2) cannot be correct because such a reading would preclude enforcement or limit the efficacy of the terms of several more recent—and more specific—statutes, all of which presuppose the potential use of testimony in exchange for non-prosecution agreements, leniency recommendations, and/or other valuable promises. *See, e.g.*, 28 U.S.C. § 994(n) (authorizing the Sentencing Commission to include in the sentencing guidelines a mechanism by which courts may reduce sentences to account for convicted defendants' substantial assistance); 18 U.S.C. § 3521 (providing for government-subsidized relocation and protection of witnesses in return for their testimony); 18 U.S.C. §§ 6002, 6003 (allowing prosecutors to obtain orders compelling witnesses to testify despite potential self-incrimination, in return for immunity from prosecution based on that testimony). These enactments would be crippled, if not rendered utterly meaningless, were we to follow the siren's call of *Singleton I*. Courts generally adhere to the principle that statutes relating to the same subject matter should be construed harmoniously if possible, and if not, that more recent or specific statutes should prevail over older or more general ones. *See HCSC–Laundry v. United States*, 450

U.S. 1, 6, 101 S.Ct. 836, 67 L.Ed.2d 1 (1981); *Morton v. Mancari*, 417 U.S. 535, 550–51, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974); *see also* 2B Norman J. Singer, Statutes and Statutory Construction §§ 51.02–03 (1992). There is no basis for eschewing that time-tested principle in this instance.

At the risk of carting coal to Newcastle, we briefly note two other bases for disavowing *Singleton I*. First, it is at least arguable that section 201(c)(2) should not apply to the government because the Dictionary Act, 1 U.S.C. § 1, which creates a frame of reference for parsing statutes, defines the word "whoever" to include "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals," but does not define the word to include the United States. *Id.; see also Ramsey*, 165 F.3d at 987. Second, even if section 201(c)(2) were applicable to the testimony of cooperating witnesses, the appropriate penalty for the use at trial of testimony obtained in derogation of the statute most likely would be a fine or imprisonment (as prescribed by the statute itself), not resort to a judicially-crafted exclusionary rule. *See United States v. Condon*, 170 F.3d 687, 689 (7th Cir.1999); *Ramsey*, 165 F.3d at 991.

We have said enough on this score. We hold, without serious question, that 18 U.S.C. § 201(c)(2) does not bar the government from promising leniency or the like to cooperating witnesses. Accordingly, the district court did not err in admitting the contested testimony.

### C. *Scope of Cross–Examination.*

■ Perry, who testified at trial in his own defense, strives to persuade us that the district court gave the government too free rein in cross-examination. We are unconvinced.[4]

Perry's thesis is that the challenged cross-examination exceeded the scope of direct examination and, therefore, should have been foreclosed. This thesis rests

4. Lara attempts to adopt this argument by a single sentence in his opening brief. We reject this overture. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.1990) (rebuffing a

similar effort on interleaved grounds of improper adoption and underdeveloped argumentation).

primarily on the first sentence of Fed. R.Evid. 611(b), which reads: "Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness." Perry notes that his direct examination consisted of only ten questions, restricted to the Vandergroen carjacking and its sequelae. *See infra* Part IV(A)(2) (describing this carjacking). Yet, the trial court allowed the prosecutor, over objection, to cross-question Perry not only about the carjacking, but also about other crimes of which he and his codefendants were accused (including the Mendez murder and two attempted homicides charged as predicate acts in the RICO conspiracy count), and about a draft of a letter seized from his jail cell in which he accused his former girlfriend of "snitching" and requested that she be silenced.

We review district court rulings anent the scope of cross-examination solely for abuse of discretion. *See United States v. Smith*, 145 F.3d 458, 462 (1st Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 383, 142 L.Ed.2d 317 (1998); *United States v. Morla–Trinidad*, 100 F.3d 1, 4 (1st Cir.1996). We find none here. It is standard fare for cross-examiners to inquire into issues not mentioned on direct examination, but related to and made relevant by that examination. *See McGautha v. California*, 402 U.S. 183, 215, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971). It is equally standard—and equally proper—for a cross-examiner to delve into matters which, although not mentioned on direct examination, bear on the witness's credibility. *See id.* Collectively, these two categories envelop the questions that Perry challenges. We explain briefly.

The indictment charged the Vandergroen carjacking as a predicate act within the RICO conspiracy and as a violent crime in aid of racketeering. At trial, the government asserted that Vandergroen's disrespect of Perry offended the Latin King code and led Perry to target him. During the government's case in chief, at least two witnesses testified in support of this theory. Because Perry's direct examination included a denial that the Vandergroen incident had anything to do with the Latin Kings, the government was entitled to test the veracity of this denial. One way of doing so was to interrogate Perry about other crimes that he had committed under the organization's auspices.

In his direct testimony, Perry also endeavored to exonerate Lara, portraying him on direct examination as unaware—until it was too late—that either the carjacking or the killing would transpire. On cross-examination, the government sought to show that this version of events conflicted with Perry's earlier statement to the police and to suggest that he was covering for Lara as part of his perceived duty as a Latin King not to "rat" on fellow gang members. It was in this context that the prosecutor asked about the correspondence in which Perry solicited punishment for his loose-lipped girlfriend. Thus, we detect no abuse of discretion in Judge Lisi's determination that these lines of cross-questioning were not beyond the scope of Perry's direct examination.

We hasten to add that, even were we to conclude that the challenged questions exceeded the scope of direct examination, we nonetheless would uphold the judge's rulings. Perry's animadversions largely overlook the second sentence of Rule 611(b), which empowers trial courts, "in the exercise of discretion, [to] permit inquiry into additional matters as if on direct examination." Fed.R.Evid. 611(b). This authorization confers discretion on trial judges to disregard the first sentence of Rule 611(b) and allow cross-examination to extend into areas not explored on direct. *See Losacco v. F.D. Rich Constr. Co.*, 992 F.2d 382, 385 (1st Cir. 1993); *United States v. Arnott*, 704 F.2d 322, 324 (6th Cir.1983); *United States v. Raper*, 676 F.2d 841, 846–47 (D.C.Cir. 1982). *But cf. Lis v. Robert Packer Hosp.*, 579 F.2d 819, 823 (3d Cir.1978) (confining the exercise of a district court's discretion under the second sentence of

Rule 611(b) to "special circumstances"). In this instance, the challenged questions occupied only a fraction of the cross-examination and bore a close relationship to major trial issues. Thus, whether or not the questions fell within the scope of the direct examination, we could not say that the trial judge's overruling of Perry's objections constituted an abuse of discretion.

## IV. SUFFICIENCY OF THE EVIDENCE

■ We next address the denial of Lara's, Boyd's, and Roman's motions for judgment of acquittal under Fed.R.Crim.P. 29. In reviewing such denials, the court of appeals affords plenary review and applies precisely the same regimen that obtains in the trial court. This regimen entails considering the evidence in the light most favorable to the prosecution and determining whether this body of proof, as a whole, has sufficient bite to ground a reasoned conclusion that the government proved each of the elements of the charged crime beyond a reasonable doubt. *See United States v. Valle,* 72 F.3d 210, 216–17 (1st Cir.1995); *United States v. Olbres,* 61 F.3d 967, 970 (1st Cir.1995). This prosecution-friendly standard requires the resolution of all evidentiary disputes and credibility questions in favor of the government, and also requires the acceptance of those reasonable inferences from the evidence (whether or not inevitable) that support the government's view of the case. *See United States v. Carroll,* 105 F.3d 740, 742 (1st Cir.), *cert. denied,* 520 U.S. 1258, 117 S.Ct. 2424, 138 L.Ed.2d 187 (1997). The jury's verdict must stand unless the record, viewed from this coign of vantage, would not allow a rational jury to find the defendant guilty beyond a reasonable doubt. *See id.; see also Olbres,* 61 F.3d at 970. With these criteria in mind, we turn to the specifics of the appellants' claims.

### A. *Lara's Challenges.*

Lara contests the sufficiency of the evidence in regard to two separate convictions. We discuss these initiatives sequentially.

### 1. *Witness Intimidation.*

■ Initially, Lara attacks his conviction for intimidating a government witness, Manuel Pacheco (variously referred to as "Manny" or "Joey"). As it applies in this case, the statute of conviction requires the government to prove two elements: (i) that the defendant knowingly used intimidation, physical force, or threats against another, and (ii) that this conduct was intended to "influence, delay, or prevent the testimony of any person in an official proceeding." 18 U.S.C. § 1512(b)(1). The term "official proceeding" encompasses both federal criminal trials and grand jury sessions. *See id.* § 1515(a)(1)(A); *see also United States v. Victor,* 973 F.2d 975, 978 (1st Cir.1992).

The facts, marshaled in the light most flattering to the government, amply support the jury's verdict on this count. The jury reasonably could have found that Pacheco aided the authorities in their investigation of the Latin Kings, that the organization's top brass suspected as much, and that they feared that Pacheco had appeared (or would soon do so) as a witness before the grand jury and/or at an ensuing trial. In November 1994, Sepulveda (then the president of the Providence chapter) ordered Pacheco's "termination" (a disposition which, in Latin King parlance, might mean anything from a beating to a slaying).

At the time, Pacheco was housed in the Rhode Island state penitentiary (as was Lara). Vasquez and two fellow Latin Kings (Alex Mesa and Rodney Santi) were dispatched to explain the situation and communicate the order to a pickup team of incarcerated Latin Kings. At the penitentiary, the three messengers visited one on one with a trio of Latin King inmates (Lara, Kareem Abdulla, and Edson Toro) and carried out their assignment. To be specific, Vasquez met with Lara, Mesa with Abdulla, and Santi with Toro. The following evening, Lara, Abdulla, Toro, and a fourth incarcerated Latin King, Richard Rodriguez, approached Pacheco in a dark corner of the prison yard. The group surrounded Pacheco and taunted

him about being a "rat." He was then struck from behind and savagely beaten.

Lara declares that this evidence is inadequate because no direct testimony showed that he received the termination order (indeed, Vasquez testified to the contrary) or participated in administering the beating. These declarations comprise more cry than wool. Mesa and Santi testified that they rode to the prison with Vasquez, that the three of them discussed the termination order en route, and that they each relayed the message to the inmate with whom they spoke. Vasquez signed the prison's visitor log. He admitted visiting with Lara. Pacheco testified that Lara had been in the group that surrounded him and had been behind him when he was struck from the rear.

Although this evidence is largely circumstantial, the jury reasonably could have disbelieved Vasquez's self-serving denial and inferred that he followed orders (as his fellow messengers had) and communicated the directive to Lara. By like token, the jury reasonably could have credited Pacheco's account and thus inferred that Lara participated in the beating. Any divergent view of the evidence would elevate coincidence to an art form. The proof, therefore, was sufficient to convict on the witness intimidation count. *See United States v. Castro–Lara,* 970 F.2d 976, 981 (1st Cir.1992) (explaining that "circumstantial evidence, in and of itself, is often enough to ground a conviction"); *see also Carroll,* 105 F.3d at 743 (noting, in the context of rejecting an insufficiency challenge, the reticence of appellate courts to "second-guess" a jury's credibility judgments).

### 2. *Carjacking.*

■ Lara and Perry were convicted of a carjacking on September 6, 1994. This scenario involved Temujin Vandergroen, who apparently precipitated the incident by playing with a knife in front of Perry's children. Perry interpreted this as a sign of disrespect, intolerable to a Latin King, and asked Lara to accompany him while he relieved Vandergroen of his Ford Escort (which was adorned with tire rims that Perry fancied).

The two men asked Vandergroen to take a ride with them. When he agreed, Perry (who had brought along a sawed-off shotgun) sat behind Vandergroen in the car, while Lara sat in the front passenger seat. At Perry's request, Vandergroen drove to a deserted neighborhood. Perry then told Vandergroen to slow or stop the vehicle, and, when Vandergroen complied, Perry shot him. Perry and Lara shoved Vandergroen's body into the street and returned to a Latin King hangout, where they were seen with blood and brain matter on their clothing. The two later burned and abandoned the car.

■ On these facts, the jury convicted Lara of carjacking in violation of 18 U.S.C. § 2119(3).[5] Lara attacks the sufficiency of the evidence from an odd angle. He does not allege that the government failed to prove that he committed specific elements of the offense, but, rather, claims that the only witness whose testimony implicated him in the carjacking (Pacheco) was unreliable. This attack is impuissant. In the usual case, the credibility of witnesses is for the jury, *see Carroll,* 105 F.3d at 743; *United States v. Laboy–Delgado,* 84 F.3d 22, 27 (1st Cir.1996), and there is nothing here that mitigates against the conventional application of this rule. There were conflicting accounts of Lara's participation in the carjacking, and the jury was free to decide which, if any, to believe.

■ Lara has a fallback position. Perry had given testimony exculpating Lara

---

**5.** At the time of the offense, the statute read: Whoever, possessing a firearm as defined in section 921 of this title, takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so, shall ... if death results, be fined under this title or imprisoned for any number of years up to life, or both. 18 U.S.C. § 2119(3) (Supp.1993). The statute has since been revised, but the amendments need not concern us.

from complicity in the Vandergroen carjacking. *See supra* Part III(C). Lara hypothesizes that Perry's disgusting courtroom conduct, *see United States v. Perry,* 116 F.3d 952, 954 (1st Cir.1997), unfairly undercut this exculpatory testimony.[6] But there is simply no evidence that Perry's conduct prejudiced the jury against Lara. When a defendant presses a plausible claim of spillover effect, differentiated verdicts often constitute tangible evidence of the jury's enduring ability to distinguish between the culpability of codefendants. *See, e.g., United States v. Flores–Rivera,* 56 F.3d 319, 326 n. 2 (1st Cir.1995). This case is of that stripe: even after Perry's dramatic display, the jury acquitted Lara, but convicted Perry, on several counts, including the charge of using or carrying a firearm during the Vandergroen carjacking. Then, too, the trial judge instructed the jurors soon after Perry's gaffe that they should draw no adverse inference therefrom against any defendant (Perry included). *See Perry,* 116 F.3d at 954. This timely instruction further supports the conclusion that Lara was not prejudiced by Perry's actions.[7] *See Richardson v. Marsh,* 481 U.S. 200, 206, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987) (remarking "the almost invariable assumption of the law that jurors follow their instructions"); *United States v. Sepulveda,* 15 F.3d 1161, 1185 (1st Cir.1993) (similar).

To sum up, because the evidence allowed a rational jury to find Lara guilty beyond a reasonable doubt of both witness intimidation and carjacking, the district court did not err in refusing to grant an instructed verdict of acquittal on either or both of these counts.

### B. *Boyd's and Roman's Challenge.*

Boyd and Roman challenge the sufficiency of the evidence to support their convictions for committing a violent crime (the murder of Jose Mendez) in aid of racketeering. The relevant facts, stated from the perspective most conducive to the verdict, are as follows.

On Saturday, November 5, 1994, several members of the Providence Latin Kings attended a party in Connecticut. On that occasion, they learned that their Connecticut counterparts were at war with a rival gang, the Netas. Two Connecticut Latin Kings returned to Rhode Island with the Providence contingent. One of them, Peter Natal, later became a confidential informant.

At a meeting of the Providence chapter held on Monday, November 7, Sepulveda told his cohorts about the war in Connecticut. Immediately after this announcement, the officers of the Providence chapter (including, at least, Sepulveda, Boyd, and Roman) went into executive session and discussed a plan to kill the leader of the Netas in Providence. This strategy was hatched on the theory that, in Sepulveda's words, "without the head, the body falls." The executive session ended on this note, the main meeting resumed, and Sepulveda asked the general membership to forget what he had said about a war.

---

6. The conduct at issue occurred during closing arguments. We quote our earlier description of the episode:

 After roughly two hours of the government's summation, at about 12:15 pm, Perry's counsel passed a note to Judge Lisi informing her that Perry wished to use the restroom. Judge Lisi interrupted the government's closing argument and called counsel to the bench. Government counsel informed her that he had about five to ten additional minutes of argument. Judge Lisi told Perry's counsel to tell Perry that proceedings would end in about five to ten minutes. Counsel did so. As government counsel resumed his argument, Perry stood up, turned his back to the jury, unzipped his pants, and urinated on the carpet.

 *Perry,* 116 F.3d at 954. After a brief recess, Judge Lisi gave an appropriate set of prophylactic instructions to the jury and the trial proceeded. During subsequent post-trial proceedings, the judge held Perry in criminal contempt and sentenced him to three months in prison. We affirmed that order. *See id.* at 957.

7. We note in passing that, following Perry's misplaced micturition, Lara moved for severance and for a mistrial. Judge Lisi denied these motions. Lara does not challenge these rulings on appeal.

Natal attended the executive session. He testified that, during this discussion, the Latin King hierarchs noted the near-dearth of local Netas; Providence was virgin territory and there were only four full members of the Neta gang at that point. Mesa confirmed this assessment. He testified that "there was [sic] very few Netas out here. There's probably like four Netas. Each one had a position [i.e., held an office in the gang]." Initially, there was confusion over whether Jose Mendez might be the president of the Providence Netas, but a consensus gradually developed in favor of the view that Winston Navarette held that office.

After the meeting adjourned, several participants repaired to the dwelling that Roman shared with his then-paramour, Tia Barboza. A small group, including Boyd and Roman, met in Tia's bedroom and finalized the plan to kill the head of the Netas. Four members were assigned responsibility for carrying out the assassination: Perry, Santi, Hakim Davis, and Juan Garcia. Witnesses stated that Boyd and Roman each chose at least one member of the "hit squad." The next day, Roman distributed weapons from the gang's cache to the appointees.

In retrospect, it appears that, at the crucial time, the Providence Netas had four officers: Winston Navarette (president), Jose Mendez (vice-president), Edgar Pichardo (disciplinarian), and Maquiva Mendez (secretary). The Netas lived together. When the hit squad arrived at their abode, they asked for Navarette and were informed that he was out of town. The trial testimony was unequivocal that when the Neta president was away, the vice-president assumed his responsibilities. Thus, Jose Mendez, nominally the Neta vice-president, was the head of the Netas in Navarette's absence.

Upon learning of Navarette's unavailability, the crew invited Jose Mendez, who was wearing his Neta colors at the time, to smoke some marijuana. The group, now five in number, walked to a nearby field where Perry shot Mendez from behind, killing him. The four Latin Kings fled.

Boyd claims that this evidence failed to link him sufficiently to Mendez's murder. He argues that even the most generous view of the evidence fails to support the jury's verdict because there was no evidence (1) that the plan was to kill whomever was the Neta leader, (2) that the shooter was aware that his target was the de facto leader, or (3) that the shooter knew Mendez had become the de facto leader of the Netas in Navarette's absence.

■ Before coming to grips with these arguments, we address a procedural issue. Roman did not raise the sufficiency question in his opening brief, but, after perusing Boyd's brief, sought leave from this court to adopt the argument. By order entered February 1, 1999, we granted this request provisionally, subject to a final determination after the case was heard.

■ The standard for adoption of arguments by reference involves a determination of whether the arguments are "readily transferrable from the proponent's case to the adopter's case." *David*, 940 F.2d at 737. We ordinarily look with disfavor upon attempts to adopt factbound arguments by reference. *See, e.g., Castro-Lara*, 970 F.2d at 982; *David*, 940 F.2d at 737. Under the peculiar circumstances of this case, however, we allow the adoption. Roman, like Boyd, moved for judgment of acquittal below, and relied on the same three grounds in support of his claim that the evidence was insufficient to convict him of Mendez's murder. More importantly, although the evidence as to each varies on the first two grounds, Boyd's arguments are generally relevant to Roman, who, like Boyd, was a part of the officers' meetings, but not a member of the crew sent to carry out the execution. Thus, the *David* "ready transferability" standard is satisfied and we will entertain the insufficiency claims of both appellants.

■ Boyd's and Roman's first two points are easily dispatched. Davis, a first-hand participant, described the plan and the implementing order as being aimed at killing the head of the Netas.[8] This order was given in the presence, and with the acquiescence, of Boyd and Roman. It was designed as a preemptive strike on the Neta leadership.[9]

■ Although some of the witnesses whose testimony the government hawks had made prior inconsistent statements, the same is true for several witnesses whose testimony Boyd and Roman espouse. The jurors were entitled to choose which witnesses to credit, and, in the posture of a sufficiency-of-the-evidence challenge, we must assume that they credited those witnesses whose testimony lent support to the verdict. *See Carroll,* 105 F.3d at 742–43; *Laboy–Delgado,* 84 F.3d at 27–28. At any rate, jurors are not required to discard testimony that appears to contain internal inconsistencies, but may credit some parts of a witness's testimony and disregard other potentially contradictory portions. *See United States v. O'Brien,* 14 F.3d 703, 707 (1st Cir.1994).

■ The third deficiency to which Boyd and Roman allude is more nettlesome. The government offered no direct evidence that the shooter (Perry) knew of Jose Mendez's position as de facto leader of the Netas at the time of the murder. Still, direct evidence is not essential to proof of criminality. *See id.* at 706–07; *Castro–Lara,* 970 F.2d at 981; *United States v. Ortiz,* 966 F.2d 707, 711 (1st Cir.1992). In this instance, the circumstantial evidence is telling: the proof (particularly the testimony of Natal and Mesa) showed that at least some Latin Kings knew there were only four full-fledged members of the Netas in Providence, and that all of them were officers of the gang. Mendez's name was bandied about at the executive session (which both Boyd and Roman attended) as the possible head of the Netas. Although consensus later formed around the idea that Navarette occupied the top rung on the ladder, the discussion of Mendez's involvement strongly suggests that the Latin King leadership was keenly aware that he held a relatively high position in the Netas.

We have held before that evidence of events that occur subsequent to the commission of a crime can shed light upon an actor's guilt *vel non.* *See, e.g., United States v. Sutton,* 970 F.2d 1001, 1007 (1st Cir.1992); *United States v. Mena,* 933 F.2d 19, 25 n. 5 (1st Cir.1991). In this instance, evidence of the Latin King leaders' reaction to the murder bolsters the government's case. Davis recalled that Sepulveda, then the Latin King president, responded to the report of Mendez's demise by remarking that the hit squad had done a good job. Moreover, the Latin Kings did not mount a manhunt for Navarette after the Mendez murder because, in Davis's words, their "mission" had been completed successfully.

■ Jurors are entitled to draw reasonable inferences from proven facts. On this record, we think that two key inferences are supportable. First, the jury reasonably could have inferred that Perry was aware of Mendez's leadership role in the Netas. Second, the jury reasonably could have inferred that when the hit squad encountered Mendez, its members believed

---

**8.** To be sure, some of the witnesses who described the order as targeting the president of the Netas mentioned Navarette by name. Nevertheless, in the context of the meetings, the jury could have understood all of them to mean that the president was targeted in an official, rather than a personal, capacity.

**9.** There was additional evidence against Roman on these issues. For one thing, Davis testified that Roman chose him to go on the mission in order to test his bravery and commitment to the Latin Kings—to "test his heart." For another thing, Roman inculpated himself in the planning, ordering and cover-up of Mendez's murder in the videotape to which we alluded previously. *See supra* Part III(A).

that he was likely the highest available member of the Neta leadership and killed him for that reason, in compliance with the order that had issued. Boyd's and Roman's alternate hypothesis—that Navarette's absence foiled the plot, and that Perry killed Mendez in order to satisfy his bloodlust—was not implausible, but the jury rejected it in favor of a finding that Perry pulled the trigger to effect the directive that had been handed down by the Latin King hierarchs. This choice fell well within the jury's proper purview. *See United States v. Gifford,* 17 F.3d 462, 467 (1st Cir.1994) (noting that the evidence "need not rule out other hypotheses more congenial to a finding of innocence" in order to defeat a Rule 29 motion). Thus, we conclude that the evidence suffices to sustain the disputed convictions. *See Bourjaily v. United States,* 483 U.S. 171, 179–80, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987) (explaining that "individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it"); *Stewart v. Coalter,* 48 F.3d 610, 615–16 (1st Cir.1995) (discussing permissible inferences in criminal cases).

## V. JURY INSTRUCTIONS

Lara offers several complaints about the district court's jury instructions on the carjacking count. Only one of these points deserves comment.

Tracking the applicable statute, 18 U.S.C. § 2119(3) (*see supra* note 5), the court instructed the jury that it must find four elements in order to convict: (1) that the named defendants (Lara and Perry), by means of force or violence, (2) took from the person or presence of Vandergroen a motor vehicle (3) that previously had been transported, shipped, or received in interstate or foreign commerce, and (4) that one or both of the named defendants possessed a firearm at the time. Lara's most fervent challenge, properly preserved, concerns the court's elaboration upon the fourth element. The court stated:

[T]he government must prove that at least one of the two defendants was in possession of a firearm. A person has possession of something if the person knows of its presence and has physical control of it, or has the power and intention to control it. More than one person can be in possession of something if each knows of its presence and has the power and intention to control it.

Lara condemns this instruction because it allowed the jury to convict him although only Perry actually possessed a firearm. And to illustrate the harmfulness of this error, Lara points out that the jury acquitted him on a related charge of using or carrying a firearm during a crime of violence, 18 U.S.C. § 924(c).

In the face of properly preserved objections, we evaluate challenged jury instructions under an abuse of discretion rubric, considering the charge as a whole. *See DeStefano,* 59 F.3d at 2–3; *United States v. Cintolo,* 818 F.2d 980, 1003 (1st Cir.1987). So viewed, Judge Lisi's possession instruction passes muster. The indictment charged Lara not only as a principal in the carjacking, but also as an aider and abettor under 18 U.S.C. § 2. In her instructions, Judge Lisi described the workings of the latter statute in considerable detail, stating, *inter alia,* "you may find a defendant guilty of the offense charged if you find beyond a reasonable doubt that the government has proven that another person actually committed the offense with which the defendant is charged, and that the defendant aided, abetted, induced, or procured that person to commit the offense." She later described the carjacking count as charging Perry and Lara with having violated both section 2119(3) and section 2. Thus, under the instructions, as long as the jury found that *either* Perry or Lara intended to take Vandergroen's vehicle by forcible or violent means and carried a firearm to that end, the other defendant could be found guilty as an aider and abettor if he knew of the plan and intended to assist in its ac-

complishment. This correctly reflects applicable law. *See United States v. Oliver*, 60 F.3d 547, 551 (9th Cir.1995), *rev'd on other grounds sub nom. Jones v. United States*, —— U.S. ——, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999); *United States v. Harris*, 25 F.3d 1275, 1278–79 (5th Cir.1994).

The jury's acquittal of Lara on the section 924(c) count does not discredit this conclusion. For one thing, the instructions on that count did not make provision for aider/abettor liability, and, therefore, the verdicts were not inconsistent. For another thing, the two statutes differ in a material respect. Section 2119(3) discusses "possession" of a firearm, while section 924(c) discusses "use and carr[iage]." Because the definitions of "use" and "carry" under section 924(c) denote more than mere possession, a jury reasonably can find, without any logical inconsistency, that a defendant who meets the requirements of the possession element under section 2119 does not meet the more rigorous requirements imposed by section 924(c).[10] *See Muscarello v. United States*, 524 U.S. 125, 118 S.Ct. 1911, 1914, 141 L.Ed.2d 111 (1998) (discussing carriage); *Bailey v. United States*, 516 U.S. 137, 143, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995) (discussing use).

If more were needed—and we do not think that it is—we note that Lara's complaint, as framed, seems to arise more from the perceived mismatch between his acquittal under section 924(c) and his conviction under section 2119(3) than from any actual flaw in Judge Lisi's charge to the jury. Thus—although Lara disclaims such a theorem—we are left with the decided impression that a claim of inconsistent verdicts lies at the heart of this assignment of error. In recent times, we

repeatedly have rejected such challenges to criminal verdicts, *see, e.g., United States v. Crochiere*, 129 F.3d 233, 239 (1st Cir. 1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1364, 140 L.Ed.2d 513 (1998); *United States v. Bucuvalas*, 909 F.2d 593, 594 (1st Cir.1990), and nothing about this case differentiates it from the mine-run.

## VI. CONCLUSION

We need go no further. A painstaking review of this amplitudinous record reveals that the appellants were convicted by a properly constituted jury after a full and fair trial, free from reversible error, before a judge who exhibited extraordinary care and patience. Their appeals are without basis in fact or in law.

*Affirmed.*

---

10. Judge Lisi's instructions on the section 924(c) count clearly reflect this dichotomy: The mere possession of a firearm is not sufficient to convict under this statute, however. Rather, the government must show the active employment of the firearm. Ex-

amples of "active" employment include, but are not limited to, brandishing, displaying, firing, attempting to fire, or making references to a firearm that are calculated to bring about a change in circumstances.