## BAY STATE DREDGING & CONTRACTING CO. v. PORTER.

### No. 4080.

Circuit Court of Appeals, First Circuit.

Feb. 14, 1946.

Hubert C. Thompson and Thompson & Twomey, all of Boston, Mass., for appellant.

A. L. Kaplan, of Boston, Mass., for appellee.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

MAGRUDER, Circuit Judge.

Plaintiff, Clarence J. Porter, suffered serious injuries on May 10, 1943, in the course of his employment as combined deckhand and deckmate on the tug "Priscilla P. White" owned and operated by defendant. The tug was 50 ft. long, driven by a Diesel engine. In addition to plaintiff, the crew consisted of a captain and an engineer. At the time of the accident de-fendant was engaged in the business of dredging a channel in Cotuit Harbor, Massachusetts. The tug was being used in the repeated operation of towing scows loaded with dredgings from a point in the Harbor to a point on the "dumping grounds" in Vineyard Sound, returning with the empty scows in tow to the vicinity of the dredger.

The complaint contained two counts, the first for negligence under § 33 of the Merchant Marine Act of 1920—the so-called Jones Act, 41 Stat. 1007, 46 U.S.C.A. § 688—and the second for maintenance and cure under the general maritime law. Such joinder was proper, as we held in Nolan v. General Seafoods Corp., 1940, 112 F.2d 515, 517. Plaintiff obtained a verdict for $30,000 on Count I and $8,000 on Count II.[1] Deducting $2,151.25 as the sum already paid to plaintiff, the jury's final verdict was in the sum of $35,848.75. Judgment was duly entered for this amount, with costs. Defendant moved for a new trial on Count I on the grounds that the verdict was against the law and the evidence and the weight of the evidence and that the damages awarded were excessive. This motion was denied. A similar motion for a new trial on Count II was denied, upon condition that plaintiff file a remittitur in the sum of $3,500, which plaintiff promptly did. The amount of plaintiff's recovery thus stands at $30,000 on the Jones Act count and $4,500 on the count for maintenance and cure, or a total of $34,500.

On this appeal defendant urges only two alleged errors as grounds for reversal: (1) the refusal of the trial judge to grant defendant's motions for a directed verdict on each count and (2) his refusal to admit in evidence a certain release signed by the plaintiff, on the ground that the release was void as a matter of law.

As to the count for maintenance and cure, which did not require proof of negligence, there was not even a shadow of plausibility to the motion for a directed verdict. The trial judge correctly told the jury that the only issue for them to consider on this count was the amount of recovery. He instructed them that plaintiff was entitled to recover the fair and reasonable cost of board and lodging of a person in his cir-

---

[1] In his charge to the jury, the trial judge was careful to point out that there should be no duplication of damages in the verdicts on the two counts and that they should consider only under Count II any allowance for medical expenses and maintenance.

cumstances for as long as the voyage lasted and also for a reasonable period thereafter during his convalescence, until he is cured so far as a cure is possible; also, all past, present and future medical and nursing expenses incurred or to be incurred in effecting a cure in so far as it is reasonably possible to effect a cure. So far as appears, no exception was taken to this charge laying down the measure of recovery; and no error in this respect has been suggested on appeal.

■ As regards the motion for a directed verdict on Count I, after a close study of the transcript of testimony we cannot say that the trial judge erred in his conclusion that there was substantial evidence from which the jury might rationally infer negligence on the captain's part resulting in injury to the plaintiff as a proximate consequence. Particularly, we would be loath to overturn a jury verdict in a case of this kind, where it is difficult, if not impossible, for an appellate court, reading the cold record, to gather the full import of the testimony as it would have been understood by trial judge and jury, due to the fact that witnesses repeatedly embellished their testimony by pointing to models of the tug and scow or by indicating on a plan or diagram. Cf. Channell v. Sampson, 1 Cir., 1939, 108 F.2d 315.

■ Just before the accident the tug had backed up to within a couple of feet of a loaded scow. There was a rope hawser 600 to 750 ft. long and 4½ in. in circumference coiled up partly on the fantail of the tug and partly on top of the deck house. Pursuant to his job as deckhand, plaintiff stepped up on the fantail and threw the end of the hawser with the bridle attached to the scowmen who were supposed to make it fast to the bitts on each side of the scow. Plaintiff then stepped off the fantail and placed a turn of the hawser around the after-bitts on the tug, as was the accustomed practice. At this point plaintiff noticed that one of the scowmen, who was inexperienced, had missed his end of the bridle, so he stepped back on the fantail, hauled the bridle and hawser from the water and threw it back to the scowman. It appears that, while plaintiff was still on the fantail instructing the scowman how to make the bridle fast, or just after he had turned and started to step off the fantail, the tug suddenly started up upon signal from the captain to the engineer. Plaintiff's right foot was caught in a bight of the hawser and was completely severed at the ankle before the captain heard the shouting and brought the tug to a stop. We cannot say that it was unreasonable for the jury to conclude that the cause of the accident was the negligence of the captain in starting up the tug without taking due precaution to ascertain whether the deckhand was well clear of the hawser. From the captain's position in the pilot house, he had only a very limited view of the stern of the tug, and could not see the position of the hawser. It was only a matter of a second or two, with no imperative need for "jumping the gun." If the captain had waited that brief interval, plaintiff would have reached a point on the deck between the rail and the deck house, a position of assured safety. The hazard of this type of accident was well understood in the business.

After first aid was administered, plaintiff was taken to the nearest hospital and his leg was amputated to a point about three inches below the knee. At the time of the trial plaintiff was still experiencing considerable pain and finding it difficult to get about even with the use of an artificial leg.

The more serious question has to do with the court's refusal to receive in evidence a release in terms as follows:

"Form B Preliminary Release

"I hereby remise, release, and forever discharge the said Bay State Dredging & Cont. Co., his or its successors, and assigns, (heirs, executors, employer administrators) from any and all claims and causes of actions, either at law, or in equity, or in admiralty or created by any State or Federal Statute, which I now have or may have in the future arising out of injuries sustained by me on or about the 10th day of May, 1943, at Cotuit Harbor, Mass. in consideration of the promise of Bay State Dredg. & Cont. Co. to pay me compensation payments in accordance with the employer schedule of payments contained in the Workmen's Compensation Act, so called, of the State of Mass., and on the further promise to furnish me the medical care and attention specified in said Compensation Act. (Extent of partial or total incapacity or disability to be determined by said employer's physician or surgeon.)

"This release does not in any way affect my right to enforce the promise of the

said Bay State Dredging & Cont. Co. made herein.

"Clarence J. Porter
"395 Meridian St. East Boston, Mass.
"Dated 6–7–43.
"Witness R. M. Tully 260 Tremont St., Boston, Mass."

If this release is valid, its legal effect is fairly clear: Plaintiff presently releases all claims and causes of action in exchange for a promise—a promise by defendant to make payments to the plaintiff in accordance with the schedule of payments in the Massachusetts Workmen's Compensation Act, and to furnish the medical care and attention specified in said Act; and if defendant fails to make the stipulated payments, plaintiff's remedy is an action to enforce the said promise.[2]

One of the defenses pleaded in the answer was that plaintiff had released all claims and causes of action and that defendant's insurer had made the weekly payments, and payments for medical care, called for by the contract of release.

On cross-examination, plaintiff admitted signing the above document. He testified that he told the agent of the insurance company he did not want to make a settlement until he found out "how good I was going to walk and how long I could stay in another job"; that he also told the agent he didn't understand the document, and was assured that it had nothing to do with settlement; that he did not realize at the time that he was relinquishing all demands against the defendant in consideration of payments according to the schedules of the Massachusetts Workmen's Compensation Act; that he did not consult a lawyer until a week or so later. The release was then marked for identification. Upon redirect examination, plaintiff testified that he hadn't read the release through in its entirety before signing it; that he hadn't understood it, and so told the agent; that he told the agent several times he didn't want to make a settlement then; that the agent assured him the document didn't have anything to do with settlement of the case, but that he would have to sign it in order to get compensation payments of $20 a week.

Subsequently, defendant called the insurance agent as a witness. On direct examination, the agent testified that he saw plaintiff at the insurance company's clinic and asked him if he was interested in an adjustment, to which plaintiff replied, "Yes, I would like to get some money"; that witness offered plaintiff the alternatives of a lump sum settlement, "or we could agree on a settlement if you will sign what we call a preliminary release" which, he explained to plaintiff, would assure payment to him of $20 a week until he returned to work, plus expenses for clinic and medical care. Further, he testified, plaintiff read the document through before signing it. At that point the release was offered in evidence. The trial judge made the following ruling, to which exception was taken:

"The agreement or release offered by the defendant is excluded because it falls within the provisions of Section 5 of the Federal Employers' Compensation [Liability] Act, and also because the defendant, through this contract, release or Agreement attempts to bar the plaintiff's remedy under the Jones Act, and to substitute therefor the remedy provided by the terms of the Massachusetts Workmen's Compensation Act and, therefore, the instrument, in my judgment, is void, and I exclude it."

Despite the fact that the release had been excluded, plaintiff's counsel proceeded without objection to cross-examine the insurance agent at length concerning the circumstances of the negotiation of the release. The agent testified that he explained to plaintiff the benefits he would receive under the release; but after some pressing by counsel he finally unequivocally admitted that he had not explained to plaintiff the various rights which he was relinquishing by the terms of the release. In fact, the cross-examination disclosed that the agent had only the foggiest notion of what plaintiff's rights were; and even if he had attempted to do so, he could not have explained plaintiff's rights with any approach to accuracy. Furthermore, the agent was quite confused as to the effect of the "preliminary release." He seemed to understand that eventually there was to be a full and final release, upon payment of a lump sum, the amount of which would subsequently be fixed by agreement. This more or less bears out the plaintiff's version

---

[2] We pass by the point that the so-called "preliminary release" is not signed by defendant and that the insurance company agent who conducted the negotiations, when asked on cross-examination whether he had authority from anyone representing defendant to make a promise on its behalf to do anything, answered flatly, "No."

that he did not understand the document to be a settlement but merely to make temporary provision for weekly payments, leaving the ultimate settlement open for negotiation after the extent of plaintiff's disability became more apparent. Excerpts from the cross-examination of the agent are set forth in footnote [3] appended at the end of this opinion.

At the conclusion of this cross-examination, defendant renewed its offer of the release in evidence, and the court excluded it again, to which exception was taken.

■ The Jones Act provides that any seaman injured in the course of his employment "may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply". This incorporates by reference the Federal Employers' Liability Act, § 5 of which provides, 35 Stat. 66, 45 U.S.C.A. § 55:

"That any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this Act, shall to that extent be void."

■ We do not believe that § 5 would invalidate a contract of release incident to a fair settlement of an accrued claim for damages. Duncan v. Thompson, 1942, 315 U.S. 1, 62 S.Ct. 422, 86 L.Ed. 575, held nothing to the contrary. There, the employer had advanced $600 to the injured employee pursuant to a written instrument under which the employee agreed that he would endeavor in good faith to adjust and settle his claim for damages without resorting to litigation; but if the claim were not so adjusted and the employee elected to bring suit, he agreed that he would first return the said sum of $600 and that said return should be "a prerequisite to the filing and maintenance of any such suit." The court pointed out that the necessitous employee in all probability would never be able to repay the $600, and held that the agreement was void under § 5 as an ingenious device which, if operative, would nullify the carrier's liability under the Act. It therefore allowed the employee to maintain his action without having repaid the $600.

■ Nor are we prepared to hold necessarily void as a matter of law a release providing for the relinquishment of all rights of action which may have accrued to an injured seaman in consideration of a settlement measured by the schedule of payments which would have been applicable to that type of injury had the seaman been subject to a particular state workmen's compensation act. In some cases this might be a fair and reasonable settlement.

In Hoffman v. New York, New Haven & Hartford R. Co., 2 Cir., 1934, 74 F.2d 227, there was no such accord and satisfaction. It appeared to have been in doubt whether the injured railroad employee came under the Connecticut Workmen's Compensation Act, Gen.St. 1930, § 5223 et seq., or the Federal Employers' Liability Act, 45 U.S. C.A. § 51 et seq. The parties entered into "an agreement in regard to compensation" under the state compensation act and this agreement was submitted for approval to the state compensation commissioner. The state act provides that acceptance of an award thereunder is a renunciation of other remedies under the state law of Connecticut. But that act also provides that it "shall not affect the liability of employers to employees engaged in interstate or foreign commerce." Hence the court held that the accord was not a compromise of any right arising under the Federal Employers' Liability Act; the adjustment was only of a local liability, and the statute permitted the compromise of none other. Since the court concluded that the employee was engaged in interstate commerce, it allowed him to maintain an action under the Federal Employers' Liability Act notwithstanding the agreement in regard to compensation which had been submitted to and approved by the state compensation commissioner.

W. J. McCahan Sugar Refining & Molasses Co. v. Stoffel, 3 Cir., 1930, 41 F.2d 651, is more nearly in point. After the accident, the seaman and his employer executed an agreement under which the seaman made an out-and-out release of his rights of action in exchange for the employer's agreement to pay him compensation in accordance with the Pennsylvania Workmen's Compensation Law. The release was held invalid on several grounds, and maybe the case was rightly decided on its facts. But one of the grounds of decision was this: Since under the series of cases commencing with Southern Pacific

Co. v. Jensen, 1917, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086, L.R.A.1918C, 451, Ann. Cas.1917E, 900, it was clear that the State of Pennsylvania could not encroach upon the maritime jurisdiction by applying its workmen's compensation act in the case of an injury to a seaman on navigable waters, the attempt of the employer to do what the state legislature could not do "was, pari ratione, equally void." It does not seem to us to follow that, because the state is without power to impose its compensation act in the particular situation, employer and employee cannot voluntarily agree to a settlement adopting as a yardstick the schedule of payments in the state compensation act. If the contract had made no mention of the state act but had set forth terms of payment which in fact coincided with the provisions of that act, the contract could hardly have been held void as a matter of law because of such coincidence. And if this is so, it is difficult to see why the contract would be any the worse for accomplishing the same result by the simpler device of incorporating by reference the schedule of payments provided in the state act.

In the case at bar, if there were any disputed questions of fact concerning the release which should have been submitted to the jury, we would be obliged to reverse. But since the separable issues of liability and amount of damages were fairly tried and submitted to the jury under appropriate instructions, the most that defendant might be entitled to would be a remand with direction for a new trial limited to the factual issues relating to the release. Gasoline Products Co., Inc., v. Champlin Refining Co., 1931, 283 U.S. 494, 51 S.Ct. 513, 75 L.Ed. 1188.

However, on the record as we have set it forth above, it is clear that the trial judge committed no prejudicial error in excluding the release from evidence. If it had been received in evidence de bene at the time it was first offered, the judge would ultimately have had to instruct the jury to disregard it.

The Supreme Court has recently had occasion, in Garrett v. Moore-McCormack Co., Inc., 1942, 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239, to restate the exacting standards by which the validity of seamen's releases must be determined. After pointing out the closeness of the analogy between seamen's contracts and those between fiduciaries and beneficiaries, the court said that the solicitude for seamen as "wards of the admiralty" has had marked consequence on the treatment given seamen's releases. It continued (317 U.S. at page 248, 63 S.Ct. at page 252, 87 L.Ed. 239):

"Such releases are subject to careful scrutiny. 'One who claims that a seaman has signed away his rights to what in law is due him must be prepared to take the burden of sustaining the release as fairly made with and fully comprehended by the seaman.' Harmon v. United States, 5 Cir., 59 F.2d 372, 373. We hold, therefore, that the burden is upon one who sets up a seaman's release to show that it was executed freely, without deception or coercion, and that it was made by the seaman with full understanding of his rights. The adequacy of the consideration and the nature of the medical and legal advice available to the seaman at the time of signing the release are relevant to an appraisal of this understanding."

Applying the foregoing to the present case, and bearing in mind that the insurance agent was negotiating with a seaman who was without benefit of counsel, we think the agent was under an obligation to bring home to the plaintiff an understanding of the rights he was giving up in exchange for the settlement offered. Otherwise, the plaintiff would necessarily not be in a position to make an intelligent decision as to whether the offer should be accepted. At the very least he should have been told that he had an unbeatable right of action under the maritime law for maintenance and cure, not dependent on proof of negligence; and that in addition he had, under the Jones Act, a right to maintain an action at law for damages for injuries resulting from the negligence of any of the officers or employees of the defendant, in which action the amount of recovery was not subject to statutory maximum limits, whereas under the compensation act the maximum recovery, apart from medical expenses, was $4,500 or perhaps $5,000. (See Mass.Ann.Laws (Michie, 1942) C. 152, §§ 34–36.) Admittedly, the agent made no such disclosure to the plaintiff. Defendant utterly failed to lay the necessary factual foundation upon which the validity of the release could have been

submitted, with appropriate instructions, to the determination of the jury.

The judgment of the District Court is affirmed, with costs to the appellee.

## THOMAS v. HUNTER, Warden.

### No. 3217.

Circuit Court of Appeals, Tenth Circuit.

March 1, 1946.

---

[3] Excerpts from cross-examination referred to supra.

X-Q. 156. Did you understand there was a difference between a case of this type and a workmen's compensation case? A. Yes, there is a difference.

X-Q. 157. What is the difference? A. The jurisdiction.

X-Q. 158. What else? A. That is all.

X-Q. 159. What other rights has he got? A. Rights?

X-Q. 160. You don't know? A. No.

\* \* \* \* \* \* \* \*

X-Q. 165. Did you feel that you had superior knowledge to him about the effect of that paper? Did you think you knew more about it, with all your years of experience in handling cases? A. I explained the paper to him, what he was doing.

X-Q. 166. You explained it to him? A. Yes.

X-Q. 167. You explained all the rights he had to him? A. Explained his rights; this was a settlement of his case, that he got $20 a week.

X-Q. 168. Did you explain to him all the rights he had under the various laws? A. I explained that he would get an artificial leg.

X-Q. 169. I understand that. Those are the benefits. I mean, what rights he has under the law. Did you explain those to him? A. His rights?

X-Q. 170. Yes. A. I told him that if he signed this paper, that it was a settlement of this case, that he would get so much a week.

X-Q. 171. Those are the benefits? A. Yes.

X-Q. 172. But did you explain the rights that he had under the various laws, the right to sue the Bay State Dredging and Contracting Company? Did you explain the different rights that he had? [Witness hesitates.] A. No.

X-Q. 173. As a matter of fact, do you know now what rights he has? A. Do I know?

X-Q. 174. Now, what rights he has? A. He had a right of action.

X-Q. 175. I mean, under what law, what statute? A. Well, the Jones Act.

X-Q. 176. Do you know what the Jones Act is? A. I don't recall the wording of it.

X-Q. 177. Right now, do you understand what the benefits of the Jones Act are? A. No.

X-Q. 178. Outside of the Jones Act, do you know anything more about any rights he might have? A. No.

\* \* \* \* \* \* \* \*

X-Q. 191. "—discharge said Bay State Dredging & Cont. Co." and so forth——"from any and all claims and causes of actions, either at law or in equity." What

rights does he have in law? A. Rights in law? To bring action.

X-Q. 192. Under what law? A. Under the Jones Act.

X-Q. 193. But you don't know what the Jones Act is? A. No, I don't.

X-Q. 194. All you know is there is an act called the "Jones Act"? A. That is right.

X-Q. 195. "or in equity". What rights did he have in equity? A. Yes.

X-Q. 196. What rights did he have in equity? A. If this instrument was not enforced, he had a right to go to equity.

X-Q. 197. "or in admiralty." What law in admiralty? A. Admiralty is governed by the Jones Act, or the Jones Act is governed by admiralty.

X-Q. 198. I don't want to mislead you. The Jones Act is a separate thing. Do you know what rights he might have in admiralty? A. No.

X-Q. 199. "or any claims created by any State or Federal statute." What rights did he have under the State statute? A. Well, he may have rights under State statute.

X-Q. 200. Well, I mean, do you know? A. Do I know?

X-Q. 201. Yes. A. Yes.

X-Q. 202. What rights has he got under the State statute? A. It is according to where he was injured.

X-Q. 203. You know what this case is, settlement of this case, You had him sign this release? What rights did he have in this particular action? A. No rights.

X-Q. 204. Under the State? A. Under the State, in this particular action.

X-Q. 205. What was that in there for, if it didn't have anything to do with it? A. That is the form.

X-Q. 206. Not taking any chances. Is that it? A. Sure.

X-Q. 207. "or Federal Statute." What rights did he have under the Federal Statute? A. In this action?

X-Q. 208. Yes, I am just talking about this action, and this paper. Under the Federal Statute, what rights did he have? A. None.

\* \* \* \* \* \* \* \*

X-Q. 266. In any event, this is headed "Preliminary Release." Your understanding was that there still had to be a full and final release. Is that right? A. Eventually, yes.

X-Q. 267. And your particular job was to tie him up until you came to that time where he would sign a full and final release, so he wouldn't be able to bother your company any more? A. To reach an agreement as to payment.

X-Q. 268. The final payment, in full and final settlement? A. Yes.

\* \* \* \* \* \* \* \*

X-Q. 271. What is the reason for using a preliminary release as distinguished from a final release? A. The final release is the payment of a sum, a lump sum. This was a release wherein the man would get so much a week until he reached the maximum. If he did not receive his weekly payments, he could enforce his rights.