# United States Court of Appeals
## For the First Circuit

No. 02-2337

ANTHONY W. RICHARDS,

Plaintiff, Appellant,

v.

RELENTLESS, INC.,

Defendant, Appellee.

GREG BRAY,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

Before

Lynch, Lipez, and Howard, Circuit Judges.

Merlyn P. O'Keefe with whom Packer & O'Keefe was on brief for
appellant.
J. Renn Olenn with whom Olenn & Penza, LLP was on brief for
appellee.

August 14, 2003

**LIPEZ**, <u>Circuit Judge</u>.    Plaintiff-appellant Anthony Richards was injured while working aboard the fishing vessel Relentless in 1998.  Richards sued his employer, Relentless, Inc., alleging violations of the Jones Act, 46 U.S.C. § 688 (2002), and the warranty of seaworthiness, and seeking recovery for maintenance and cure under general principles of maritime law.  The jury found that Richards's recovery was precluded by a release of claims he signed shortly after his accident.  In this appeal, Richards asks us to vacate the jury verdict in favor of Relentless on a variety of grounds.  Finding no reversible error, we affirm.

## I.

Richards was working as a deck hand on the F/V Relentless in February 1998 when he stepped onto the deck one morning, slipped on squid tentacles, and fell.  After the vessel returned to port later that month, Richards sought medical attention for his injury. He was examined by Dr. Robert Marchand, an orthopedic surgeon, and complained that he could not raise his leg and was experiencing "shooting pains" down that leg.  Dr. Marchand performed a bone scan to rule out a fracture, and eventually diagnosed the injury as a hip contusion.  Dr. Marchand prescribed pain medication and an anti-inflammatory, and on March 16, 1998, signed a "fit-for-duty" slip authorizing Richards to return to work on March 23, 1998. While Richards was out of work after his hip injury, the Relentless went out on two fishing trips.

-2-

On May 13, 1998, after Richards had returned to work on the Relentless, he signed a release waiving any claims against the Relentless and its insurers arising from the February injury in exchange for a settlement of $8,000, in addition to the maintenance and cure[1] he had already received. The terms of the release stated that Richards was settling "every right and claim [he] ha[d] for damages as well as for past, present and future maintenance, cure, and wages." Richards negotiated the amount of the settlement over a three-day period with Neil Stoddard, a claims adjuster representing Sunderland Marine Mutual Insurance Company, defendant's insurance carrier.

On February 7, 2001, Richards filed suit against Relentless and Greg Bray, who was the captain of the Relentless at the time of Richards's injury.[2] After discovery, the defendant moved to bifurcate the proceedings and first try its asserted affirmative defense -- the validity of the release Richards signed -- before reaching the personal injury claims. If the release Richards signed in May 1998 was deemed valid by the jury, he would

---

[1] Maintenance and cure is the traditional form of compensation paid to a seaman who becomes ill or injured aboard a vessel. The value of the maintenance paid must be comparable to what the seaman is entitled to while aboard the vessel, and cure is the cost of the medical care he receives. Calmar S.S. Corp. v. Taylor, 303 U.S. 525, 527-28 (1938). The duty of paying maintenance and cure falls to the owner of the vessel. Id. at 528.

[2] The claims against defendant Bray were dismissed before trial.

be precluded from recovering against the defendant. Over Richards's objection, the court granted the motion for a bifurcated trial. After a three-day trial, the jury returned a verdict for the defendant, finding that the release was valid and enforceable. Because the jury found that the defendant had established its affirmative defense, there was no need to proceed to the second stage of the trial, and the court entered judgment in favor of the defendant.

Richards alleges five errors on appeal: (1) failure to award Richards judgment as a matter of law under Rule 50; (2) the magistrate judge's denial of Richards's motion to amend the complaint to add claims against Sunderland, the defendant's insurer; (3) the acceptance of the defendant's use of a peremptory strike against a Hispanic juror; (4) the district court's instructions to the jury on the legal standards applicable to a release of claims under the Jones Act; and (5) the district court's ruling that Richards's second doctor's testimony was irrelevant. We will address these arguments in turn.

**II.**

**A. Rule 50 Motion**

At the close of the defendant's presentation of evidence, Richards moved for judgment as a matter of law under Rule 50.[3] He

---

[3] Since the defendant had to establish by a preponderance of the evidence the validity of the release, the defendant presented its case first.

-4-

renewed his motion after the close of his case. The court withheld its ruling until after the jury's verdict, and then denied the motion in a written opinion. The court noted that the defendant had presented evidence concerning the medical advice Richards had at the time he signed the release, the amount of income he lost during his period of recovery, and the amount of the settlement he received. The defendant also presented evidence on the content of the negotiations between Richards and Stoddard, and the explanation of rights Stoddard gave Richards before Richards signed the release. Given this evidence, the district court held that it could not "say that there was a legally insufficient evidentiary basis from which the jury could reasonably find in favor of the defendant." Richards v. Relentless Inc., No. 01-64ML, slip op. at 9 (D.R.I. Sept. 20, 2002).

We review the court's denial of the motion de novo. Espada v. Lugo, 312 F.3d 1, 2 (1st Cir. 2002). Judgment as a matter of law under Rule 50(a) is appropriate if "there is no legally sufficient evidentiary basis for a reasonable jury to find for [the non-moving] party." Fed. R. Civ. P. 50(a). When reviewing the district court's denial of the motion, we examine the evidence in the light most favorable to the non-moving party -- here, the defendant -- and do not "consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence." Katz v. City Metal Co., 87 F.3d 26, 28 (1st Cir.

1996) (quoting <u>Richmond Steel, Inc.</u> v. <u>Puerto Rican Am. Ins. Co.</u>, 954 F.2d 19, 22 (1st Cir. 1992)). We affirm the denial of the motion unless "reasonable persons could not have reached the conclusion that the jury embraced." <u>Negron-Rivera</u> v. <u>Rivera-Claudio</u>, 204 F.3d 287, 290 (1st Cir. 2000).

In cases involving seamen, the burden is on the defendant to show that a release of claims "was executed freely, without deception or coercion, and that it was made by the seaman with full understanding of his rights." <u>Garrett</u> v. <u>Moore-McCormack Co.</u>, 317 U.S. 239, 248 (1942). In the <u>Garrett</u> case, the Supreme Court recognized that the relationship between a seaman and his employer was unlike the traditional employee-employer relationship. Seamen are "wards of admiralty," and their relationship with their employers is similar to the relationship between a beneficiary and fiduciary. <u>Id.</u> at 246. Necessarily, then,

> [i]f there is any undue inequality in the terms, any disproportion in the bargain, any sacrifice of rights on one side, which are not compensated by extraordinary benefits on the other, the judicial interpretation of the transaction is that the bargain is unjust and unreasonable, that advantage has been taken of the situation of the weaker party, and that <u>pro tanto</u> the bargain ought to be set aside as inequitable.

<u>Id.</u> (internal citations and quotation marks omitted). Therefore, releases signed by seaman "are subject to careful scrutiny. 'One who claims that a seaman has signed away his rights to what in law is due him must be prepared to take the burden of sustaining the

-6-

release as fairly made with and fully comprehended by the seaman.'" Id. at 248 (quoting Harmon v. United States, 59 F.2d 372, 373 (5th Cir. 1932)). In order to satisfy this burden of showing the release is valid, the party seeking to enforce it must

> show that it was executed freely, without deception or coercion, and that it was made by the seaman with full understanding of his rights. The adequacy of the consideration and the nature of the medical and legal advice available to the seaman at the time of signing the release are relevant to an appraisal of this understanding.

Id. at 248.

There are special concerns that arise when a seaman is signing a release without the benefit of counsel. In such a situation, there is a burden on the agent of the vessel owner or insurance carrier negotiating the release with the seaman to "bring home to the plaintiff an understanding of the rights he [is] giving up in exchange for the settlement offered." Bay State Dredging & Contracting Co. v. Porter, 153 F.2d 827, 833 (1st Cir. 1946). More specifically:

> At the very least [the seaman] should have been told that he had an unbeatable right of action under the maritime law for maintenance and cure, not dependent on proof of negligence; and that in addition he had, under the Jones Act, a right to maintain an action at law for damages for injuries resulting from the negligence of any of the officers or employees of the defendant.

Id. Therefore, in order to prove the validity of a release, the party seeking to enforce it must show that it gave the seaman a

full explanation of his rights before he signed the release. The logic of such a rule is clear: "Otherwise, the [seaman] would necessarily not be in a position to make an intelligent decision as to whether the offer [of settlement in exchange for the release] should be accepted." Id.

Stoddard, working on behalf of Sunderland, Relentless's insurance agent, testified at trial that he negotiated the settlement with Richards over a three-day period. Stoddard first called Richards on May 11 with an offer of $6,000, which Richard rejected. Richards then called Stoddard the next day and they agreed to settle the claim for $8,000. Stoddard and Richards met at the Relentless offices on May 13 so that Richards could sign the release and receive his settlement check. Stoddard testified that before Richards signed the release, he explained the effect of the release and Richards's rights:

> I said to him that just because we had prepared this document and because I had traveled to North Kingstown, Rhode Island, didn't mean that he had to go through with the signing of the release; that any time he became uncomfortable with anything that he read, that was read to him or anything that was said to him, he could stop the conference, he could take a copy of the release and he could go talk to an attorney. After I told him that, I told him that he also had the absolute right to get a second medical opinion. He could either go back to his treating physician, Dr. Marchand, or he could go get a second opinion from another doctor that we would pay for.

Stoddard also testified that he "discussed the Jones Act with [Richards], the fact that he was giving up his rights to any claim under the Jones Act by signing that document" and also explained that by signing the release he was "giving up any right to recovery . . . from unseaworthiness." In terms of explaining the meaning of these claims to a non-lawyer, Stoddard testified that he "was generally explaining to him what unseaworthiness was, what negligence was and what rights he was giving up by signing this document."

Regarding maintenance and cure, Stoddard testified that "prior to signing the release, I explained to him what maintenance was, that it was the $15 a day that we had paid him,[4] and that by signing this release he would give up any right to any continued or further maintenance." Stoddard also explained that the insurance company would pay any remaining medical bills Richards had yet to receive from doctors visits he had made prior to the date of the release.

Richards did not present an alternative version of what occurred in the meeting between him and Stoddard on the day he signed the release. Therefore, even after the close of the plaintiff's case, Stoddard's description of the explanation he gave

---

[4] Relentless's insurer paid Richards $15 a day in maintenance for those days in February and March he was injured and could not fish. Since Richards had returned to work by the time the release was being negotiated, he had stopped receiving maintenance payments.

Richards before he signed the release was uncontradicted. Given this testimony, we cannot say that no reasonable jury could have found for Relentless on the validity of the release under Garrett and Bay State Dredging. Richards's motion for judgment as a matter of law was properly denied.

## B. Motion to Amend

Prior to trial, Richards moved to amend his complaint to add a claim against Sunderland, the defendant's insurance carrier, for tortuous interference with the employment relationship between Richards and Relentless. Richards argued that Sunderland interfered with Relentless's contractual burden to pay Richards's daily maintenance during his period of convalescence because Sunderland set its maximum payment at $15 per day. Relentless objected to the amendment, and the motion was referred to the magistrate judge. After a hearing on the issue, the magistrate judge denied leave to amend, holding that the amendment sought by Richards would be futile because "there is a requirement that for the action of tortuous interference with contractual relations to be maintained the defendant must be a stranger to the contract," and Sunderland was not a stranger to the contract between Richards and Relentless. The district court affirmed the decision without comment. "We review denials of leave to amend under Rule 15 for abuse of discretion, deferring to the district court for any

-10-

adequate reason apparent from the record." Resolution Trust Corp. v. Gold, 30 F.3d 251, 253 (1st Cir. 1994).

We agree with the magistrate judge's reading of the law, see Finley v. Giacobbe, 79 F.3d 1285, 1295 (2d Cir. 1996) (holding that a plaintiff bringing a tortuous interference claim must show that the defendant was not a party to the contract), and its determination that Sunderland was not a stranger to the contract. When Sunderland informed Richards it would pay him $15 a day in maintenance, it was acting on behalf of Relentless. The burden of paying maintenance to an injured seaman falls to the vessel. See Calmar S.S. Corp., 303 U.S. at 528. In this case, Relentless voluntarily contracted that burden to Sunderland when it purchased an insurance policy. Sunderland cannot be considered a "stranger" or "third-party" to the contract between Richards and Relentless within the meaning of the tortuous interference case law. The ruling on the motion to amend the complaint was correct.

## C. Use of Peremptory Challenge

Richards argues that Relentless's use of a peremptory strike against prospective juror Corazon Fernando violated Batson v. Kentucky, 476 U.S. 79 (1986), which prohibits the use of peremptory strikes based on the race of the juror. After Richards objected to the use of the peremptory against Ms. Fernando, the

-11-

magistrate judge[5] asked Relentless to explain the basis of its challenge. Noting that Ms. Fernando was a resident of Pawtucket, Rhode Island, Relentless's counsel explained:

> The basis of my challenge, your Honor, is that Pawtucket and Central Falls is the largest area of cocaine dealing in the state, and I have a substantial number of convictions of the Plaintiff for cocaine use. And it's my concern that this woman may be from an area where cocaine use is found more acceptable than in other places and it would diminish the use of my impeaching material.

Taking this explanation into consideration, and noting that Relentless did not challenge two other jurors of color, the magistrate judge concluded that Relentless's peremptory challenge was not motivated by racial discrimination. On appeal, Richards contends that it was error for the court to have taken into consideration Relentless's failure to challenge other jurors of color, and that the explanation Relentless offered was a surrogate for an impermissible racial bias.

We employ a three-part framework to evaluate the claim that the use of a peremptory challenge violated <u>Batson</u>. <u>See</u> <u>United States</u> v. <u>Bergodere</u>, 40 F.3d 512, 515 (1st Cir. 1994). First, the party objecting to the challenge "must make a prima facie showing of discrimination" in the opposing party's use of the challenge. <u>Id.</u> If the objecting party "fulfills this requirement by

_____

[5] The jury in this case was impaneled by Magistrate Judge Martin according to the district court's pretrial order.

-12-

establishing, say, a prima facie case of a racially driven impetus," the party seeking to use the challenge "must proffer a race-neutral explanation for having challenged the juror." Id. Once such an explanation is given, the district court must then decide whether the objecting party "has carried the ultimate burden of proving that the strike constituted purposeful discrimination on the basis of race." Id. As this decision involves "a mixed question of law and fact that is peculiarly fact-sensitive, we review it for clear error." United States v. Lara, 181 F.3d 183, 193 (1st Cir.), cert. denied, 528 U.S. 979 (1999); see Rodriguez-Hernandez v. Miranda-Velez, 132 F.3d 848, 855 (1st Cir. 1998) (applying clear error review to this question in a civil case).

To make a prima facie showing, Richards described his race as black, and offered the opinion that the challenged juror, Corazon Fernando, was Hispanic, given her surname and "Spanish accent." Assuming arguendo that these considerations satisfied Richards's prima facie case, we next consider the defendant's race-neutral explanation. "In order to meet the second-step requirement, a [party's] explanation need only be unrelated to race on its face." Lara, 181 F.3d at 194; see Hernendez v. New York, 500 U.S. 352, 360 (1991) ("Unless a discriminatory intent is inherent in the [attorney's] explanation, the reason offered will be deemed race neutral."). The explanation Relentless offered --

that Ms. Fernando was being challenged because of her city of residency, not her race -- satisfies this burden.

Once a race-neutral explanation is offered, the court is presented with the ultimate question -- whether the objecting party has convinced the court that this race-neutral explanation "rings hollow." Lara, 181 F.3d at 194. The magistrate judge accepted Relentless's explanation:

> I do not find that the challenge was motivated by racial discrimination. I note that [Relentless's attorney] has left two persons who appear to be black persons on the jury. I also note that the reason offered is not one which indicates to the Court that it's based on race.

Richards argues that striking Ms. Fernando based on her city of residence was a proxy for striking her on the basis of her race because Pawtucket has a larger Hispanic population than other towns in Rhode Island. This statistical fact alone cannot convert a facially race-neutral explanation into one based on race. See Caldwell v. Maloney, 159 F.3d 639, 654 (1st Cir. 1998) ("But even when the criterion used by the prosecutor has a discriminatory impact, unless the government actor adopted a criterion with the intent of causing the impact asserted, that impact itself does not violate the principle of race neutrality."); cf. Hernandez, 500 U.S. at 360 (holding that a prosecutor's explanation that he was striking Spanish-speaking jurors was race-neutral, given the fact that witnesses would be testifying in Spanish and that the

testimony would be officially translated into English in court by a court-appointed translator).  Although Relentless's posited link between residency and a forgiving attitude towards the use of cocaine seems a bit of a stretch, our role is not to evaluate whether the use of the challenge was wise, but merely whether it was race-neutral.  Richards's proxy argument does not convince us that the magistrate judge clearly erred.  As we have said previously, because this decision "often pivots on credibility, appellate tribunals must scrutinize the trial court's response under a highly deferential glass."  Lara, 181 F.3d at 194; see Caldwell, 159 F.3d at 649 ("[A] trial judge's Batson findings are given substantial weight because the trial judge is in the best position to evaluate context, nuance, and the demeanor of the prospective jurors and the attorneys.").

In accepting the race-neutral explanation for the use of the peremptory challenge, the court also relied on the presence of other jurors of color who were not challenged.  Although Richards argues otherwise, the race and ethnicity of the jurors seated, especially when those jurors are of the same racial group as the objecting party, is a permissible consideration. See United States v. Escobar-De Jesus, 187 F.3d 148, 165 (1st Cir. 1999) (rejecting Batson argument and noting that "six or seven African-Americans were eventually selected to serve on the jury"); Lara, 181 F.3d at 194 (stating that the lack of a pattern of discrimination in the

-15-

use of peremptories is relevant to determining whether a race-neutral explanation is pretextual).  Therefore, we find no clear error in the magistrate judge's decision to permit the use of the peremptory.

**D. Jury Instructions**

Richards contends that the district court's instructions to the jury "did not reflect the vaunted status of seamen who sign personal injury releases" because the court failed to explain the tremendous burden on a vessel owner seeking to enforce a release against an injured seaman. More specifically, Richards argues that the district court erred in instructing the jury (1) that by signing the release the plaintiff "gave up certain rights,"[6] (2) that the jury was not to consider which party was at fault for the underlying injury when considering the validity of the release,[7] (3) that the jury was to determine whether the plaintiff had a

---

[6] The district court charged the jury, in pertinent part,

This case involves the validity of a release entered into by the Plaintiff and the Defendant as a result of an injury suffered by the Plaintiff on the Defendant's fishing vessel. By signing that release, the Plaintiff gave up certain rights in exchange for a lump sum cash settlement. As the jury, you must decide, in light of the law as I will describe it to you and in light of the facts as you find them to be, whether the release in this case is valid or invalid.

[7] The district court told the jury "[y]ou are not to decide which party was or was not at fault with regard to the underlying injury, but rather only whether the release that was entered into after the accident is valid. . . ."

-16-

"fair understanding" of his rights when he signed the release,[8] and

(4) that the jury must consider whether the compensation the

plaintiff received was "plainly inadequate."[9]

[8] The relevant portion of the instruction stated:

In order for a release of a seaman's claim to be valid, it must be entered into knowingly and voluntarily. In other words, the seaman must have had an informed understanding of his rights and a full appreciation of the consequences when he executed the release.
. . . .
First, you must determine whether the Plaintiff understood the nature of his injuries at the time that he signed the release. Second, you must consider whether the Plaintiff had a <u>fair understanding</u> of his legal rights before he signed the release. And third, you must consider whether the Defendant used unfair practices in reaching the settlement described in the release, that is, whether the terms of the release so unfairly favored the Defendant that the release must be invalidated.

[9] On the question of the adequacy of the compensation the plaintiff received, the court instructed:

If you find that the amount of the settlement was <u>plainly inadequate</u> for the Plaintiff's injuries at the time the release was signed, you may consider that as evidence in determining whether the Plaintiff understood his rights at the time the release was signed. However, inadequate compensation alone is not enough to find the release invalid. If you decide that the amount is <u>plainly inadequate</u>, you must still find for the Defendant unless you decide that there are other considerations that lead you to believe that the Plaintiff did not have the required understanding of his rights at the time he entered into the release. . . . In sum, you must first decide whether the compensation was <u>plainly inadequate</u> or not. If, and only if, you decide that it is <u>plainly inadequate</u> may you then consider that as evidence in determining whether Plaintiff understood his rights. . . .

"A jury instruction, duly objected to, constitutes reversible error only if it (i) is 'misleading, unduly complicating, or incorrect as a matter of law'; and (ii) cannot be considered harmless, viz., as adversely affecting the jury verdict and the 'substantial rights' of the objecting party." Davignon v. Clemmey, 322 F.3d 1, 9 (1st Cir. 2003) (quoting Crowley v. L.L. Bean, 303 F.3d 387, 394 (1st Cir. 2002), and Romano v. U-Haul Int'l, 233 F.3d 655, 665 (1st Cir. 2000)). Richards made timely objections to these jury instructions at trial, and renews his arguments on appeal that the first challenged instruction was misleading, and that the other three challenged instructions were incorrect as a matter of law.

### 1. "Plaintiff gave up certain rights. . . ."

There was nothing misleading about the first challenged instruction. Immediately after explaining that the plaintiff gave up certain rights by signing the release, the court outlined the jury's task: "[Y]ou must decide, in light of the law as I will describe it to you and in light of the facts as you find them to be, whether the release in this case is valid or invalid." Given that statement, and the subsequent instructions focusing on the factors the jury should consider when determining the validity of the release, the judge made clear to the jury that the waiver of rights contained within the release would be enforced against the plaintiff only if the release was valid.

-18-

## 2. "You are not to decide which party was or was not at fault. . . ."

The district court had decided to bifurcate the trial, addressing the validity of the release first and then moving on to issues of fault only if necessary. Fault testimony and argument during the "release" stage of the trial would have defeated the purpose of the bifurcation. Hence, it was important for the court to remind the jury that comparative fault was irrelevant at this stage of the proceedings.

Richards argues otherwise, contending that fault is relevant to the question of whether the consideration he received for signing the release was adequate. Assuming arguendo that his contention has some validity (a point we do not concede), his argument is too little too late. Richards does not argue on appeal that the district court erred in bifurcating the case into separate "release" and "personal injury" trials, even though he objected to the defendant's pre-trial motion to bifurcate. Therefore, the bifurcation ruling -- and the court's decision to put off all discussion of comparative fault until the second stage of the trial -- stands, and Richards has waived any argument that depends on the invalidity of the bifurcation ruling. Smilow v. Southwestern Bell Mobile Sys., 323 F.3d 32, 43 (1st Cir. 2003) ("Issues raised on appeal in a perfunctory manner (or not at all) are waived."). Richards's argument that comparative fault is relevant to the release relies on the theory that the questions of fault could not

be separated from a determination of the validity of the release. But his assertion on appeal that the jury instruction was erroneous, without an accompanying argument that the bifurcation was erroneous, is illogical. Therefore, the court's instruction to the jury not to consider fault when determining its verdict in the first stage of the trial was correct.

### 3. "Fair understanding of his rights. . . . Whether compensation was plainly inadequate. . . ."

After reviewing the third and fourth challenged instructions, we conclude that they were incorrect statements of the law. The standards for judging a seaman's release of claims were laid out by the Supreme Court in Garrett, 317 U.S. at 248, and discussed in Part II.A. of this opinion. In the Garrett case, the court announced the oft-quoted rule by which future courts should analyze releases signed by seamen:

> We hold, therefore, that the burden is upon one who sets up a seaman's release to show that it was executed freely, without deception or coercion, and that it was made by the seaman with full understanding of his rights.

Id. (emphasis added), quoted in Orsini, 247 F.3d at 959; Simpson v. Lykes Bros. Inc., 22 F.3d 601, 602 (5th Cir. 1994); Bay State Dredging, 153 F.2d at 833; Pereira v. Boa Viagen Fishing Corp., 11 F. Supp. 2d 151, 152 (D. Mass. 1998). The district court's instruction to the jury, that it "must consider whether the Plaintiff had a fair understanding of his legal rights before he

signed the release," was not a correct statement of the principle of Garrett.

The district court also instructed the jury that it needed to decide whether the amount of the settlement Richards received was "plainly inadequate." Richards argues that the correct standard is "inadequate," without the modifier. The Garrett court did not use the modifier "plainly" when discussing the adequacy of consideration. See 317 U.S. at 248 ("The adequacy of the consideration . . . [is] relevant."); id. at 247 (holding that the burden of persuasion on a shipowner "is particularly heavy where there has been inadequacy of consideration"). Nor have we ever held that consideration for a Jones Act release must be "plainly inadequate" in order to justify an invalidation of such a release. See Bay State Dredging, 153 F.2d at 833 (discussing the "adequacy of the consideration") (quoting Garrett, 317 U.S. at 248). The district court's chosen wording of the jury instruction -- "plainly inadequate" -- is not supported by prior Supreme Court or First Circuit precedent.

In its defense of the jury instruction, the defendant cites a trio of Ninth Circuit cases where the court described consideration for a release as "wholly inadequate," Orsini, 247 F.3d at 962, "plainly inadequate," Resner v. Arctic Orion Fisheries, 87 F.3d 271, 274 (9th Cir. 1996), and "clearly inadequate," Durden v. Exxon Corp., 803 F.2d 845, 848 (9th Cir.

1986).  However, none of these cases involved a challenge to jury instructions on appeal.  In those cases, the court was reviewing de novo the consideration offered for the releases and concluding that the consideration offered failed the adequacy test by a wide margin.  Although it may have characterized the consideration as "plainly inadequate," it never stated that inadequate consideration could be evidence of a seaman's lack of understanding of his rights only if it rose to the level of "plainly inadequate" consideration.  Defendant's insistence on the "plainly inadequate" language in the district court, like its insistence on the "fair understanding" language, was ill-advised overreaching.

In summary, the controlling language in a case such as this remains as stated by the Supreme Court in <u>Garrett</u>.  The party asserting a seaman's release as an affirmative defense must

> show that it was executed freely, without deception or coercion, and that it was made by the seaman with full understanding of his rights.  The adequacy of the consideration and the nature of the medical and legal advice available to the seaman at the time of signing the release are relevant to an appraisal of this understanding.

<u>Garrett</u>, 317 U.S. at 248.  If the jury finds that the compensation or settlement the seaman received was inadequate, it may consider that inadequacy of consideration as evidence that the plaintiff did not understand his rights at the time he signed the release.  <u>Id.</u> at 247.

## 4. Harmless Error

An error in a jury instruction is governed by the harmless error standard -- "a new trial is necessary only if the error could have affected the result of the jury's deliberation." Romano, 233 F.3d at 667; see Davignon, 322 F.3d at 9; Fed. R. Civ. P. 61. The court's use of the term "fair" instead of "full," while arguably placing a lighter burden on the defendant, must be considered in the context of the instruction as a whole. After charging the jury with the task of determining whether the plaintiff "had a fair understanding of his legal rights," the court elaborated on the factors that informed the jury's analysis of the understanding issue: the adequacy of the medical and legal advice Richards had when he signed the release; the adequacy of the compensation Richards received; and whether the defendant used "unfair practices" to secure the release from Richards. These factors were outlined in Garrett and reaffirmed by our court in Bay State Dredging. Therefore, the court did not fail to identify any of the considerations that inform the concept of a "full understanding." Under these circumstances, the mistaken use of "fair understanding" instead of "full understanding" was a harmless error.

We arrive at the same conclusion when we consider the court's use of the phrase "plainly inadequate" instead of "inadequate." Richards argues that these phrases have a different

-23-

import, and we agree. Under Garrett, the party seeking to enforce the release has the burden of proving that the consideration is adequate. If the jury concludes that the consideration was "inadequate," the jury may then consider that inadequacy in deciding if the seaman had a full understanding of his rights when he signed the release. By instructing the jury that the amount of consideration could be evaluated as evidence of the seaman's understanding only if the jury found that the consideration was "plainly inadequate," the judge made it less likely that the inadequacy of the consideration would become relevant to the seaman's understanding of his rights.

In another case, this particular error could have affected the result of the jury's deliberation. Here, however, we conclude that the error was harmless because of the strength of the evidence on the adequacy of the consideration. The defendant introduced evidence that Richards received an $8,000 settlement for what he believed, at the time he signed the release, was only a bruise to his left hip. He also received maintenance payments of $435 and cure in the amount of $702.16. By the time Richards negotiated and accepted the settlement, his doctor had told him that he had recovered from his injury, and Richards was already back at work on the Relentless after missing only two fishing trips. On these facts, a jury would be hard pressed to conclude that the settlement was not adequate.

**E. Relevance of New Doctor's Testimony**

In his final argument, Richards asserts that the district court erred in ruling that the testimony of Dr. Bellafiore, a physician Richards began seeing in 2001, was irrelevant to the issues being tried in the first part of the trial. A district court has broad discretion to make relevancy determinations, and we review its decisions only for abuse of discretion. Tiller v. Baghdady, 244 F.3d 9, 14 (1st Cir. 2001). In his brief on appeal, Richards argues that Dr. Bellafiore would have testified that Richards was suffering from a neurological problem in his leg relating back to the fall on the Relentless. According to Richards, this diagnosis contradicts Dr. Marchand's prior diagnosis of a hip contusion[10] and casts doubt on whether Richards had adequate medical advice when he signed the release.

Whatever the merits of this argument on appeal, see Charpentier v. Fluor Ocean Servs., Inc., 613 F.2d 81, 85 (5th Cir. 1980) ("A mistaken diagnosis concerning the extent of a plaintiff's injury has been recognized as a basis for setting aside a release."), Richards failed to explain the relevance of Dr. Bellafiore's testimony to the district court. In his Objection to the Defendant's Motion in Limine, Richards stated only that Dr. Bellafiore found "there to have been more tha[n] a bruise caused by Plaintiff's fall aboard the F/V Relentless in February 1998 in

---

[10] Dr. Marchand testified to this diagnosis at trial.

-25-

terms of intensity and duration." When the court was addressing the various motions in limine before the trial began, Richards's attorney and the district court had the following exchange regarding Dr. Bellafiore:

> MR. O'KEEFE [Richards's attorney]: Peter Bellafiore being Mr. Richards's neurologist, was going to say that at the time of the fall, he injured a nerve. That's the evidence I was going to put on, and that I think is relevant, your Honor.
>
> THE COURT: Well, I think what you're going to need to do is to make an offer of proof along those lines. I have not seen any records from Dr. Bellafiore, nor have I seen any deposition testimony.
>
> MR. O'KEEFE: He has not been deposed, your Honor.
>
> THE COURT: Then I suggest to you that you may need to present an affidavit or at least a report that reflects precisely what Dr. Bellafiore's testimony would be rather than a summary of what you believe his testimony might be along those lines because I think that we need to be very clear in an offer of proof of precisely what evidence the Court is ruling inadmissible.

There is no indication in the record that any such document was filed with the court. Instead, at trial, Richards's attorney made a verbal offer of proof regarding Dr. Bellafiore's testimony:

> Peter Bellafiore is a board certified neurologist to whom Mr. Richards was referred by Dennis Jones. The referral, your Honor, came sometime in 2001, after Dr. Jones became of an opinion that it was a neurological problem causing Mr. Richards the problems that he had and not so much the arthritis, although the arthritis flare-up was a problem as well.

-26-

> Dr. Bellafiore would say he's seen him four or five times and that he has a diagnosis of neuralgia that he relates back to the fall of February 1998 as described to him by Mr. Richards, and he would say that Mr. Richards is not able to go back to sea.

On the basis of that offer of proof, the court concluded that Dr. Bellafiore's testimony was not relevant to the question of the validity of the release. We agree.

"[T]he nature of the medical and legal advice available to the seaman <u>at the time of signing the release</u> are relevant to an appraisal of [whether the seaman understood the rights he was waiving]." <u>Garrett</u>, 317 U.S. at 248 (emphasis added). Absent an offer of proof linking Dr. Bellafiore's testimony to the adequacy of the medical advice Richards had at the time he signed the release, such as testimony that Dr. Marchand erred by failing to diagnose nerve damage back in 1998, the testimony was properly excluded. <u>United States</u> v. <u>Lussier</u>, 929 F.2d 25, 31 (1st Cir. 1991).

## III.

For the aforementioned reasons, we find no reversible error in any of Richards's claims.

AFFIRMED.